# THE JAMES CLARK COMPANY AND WINFIELD S. CAHILL *vs.* WILLIAM COLTON AND SIMON P. SCHOTT, RECEIVERS.

*Payment of Their Own Claims by Officers of an Insolvent Corporation—Unlawful Preferences—Knowledge of Insolvency of Bank by its Directors—Bill for Appointment of Receivers of a Corporation and its Dissolution—Effect of Decree—Distribution of Assets Under the Insolvent Law.*

Officers of a corporation, who are also its creditors, cannot lawfully pay their own claims in preference to other creditors, when the corporation is insolvent.

When the affairs of a corporation become embarrassed to such an extent that it is evident that it cannot continue to conduct business and will be unable to pay all of its debts in full, the directors of the corporation are to be treated as trustees for all the creditors, and cannot lawfully pay their own claims, although the corporation may not have been adjudged insolvent or have yet failed to pay any of its debts in the due course of business. The invalidity of such preferences does not depend upon the provisions of the Insolvent Law, but results from the unfair character of the transaction and its violation of the equitable principle that all the creditors of an insolvent should be treated with equality.

When the fact that a corporation is insolvent may be easily ascertained from an examination of its books, the directors are chargeable with knowledge of that fact, whether they did really know it or not.

The president of a bank caused a note payable to a corporation, of which he owned nearly all the stock, to be paid by the bank when it was hopelessly insolvent and shortly before receivers for it were appointed. The directors of the bank also at the same time caused a demand, note on which they were endorsers, to be paid. *Code,* Art. 23, secs. 264 and 264A, provide that when any corporation is proved to be insolvent it may be dissolved by a decree upon a bill filed for that purpose, and that then its property shall be distributed in the manner required by the insolvent laws, and the receiver of the corporation shall have the same power to bring suit and set aside payments and preferences made by the corporation or its officers, as is possessed by the trustee of an insolvent debtor. A bill was filed against the above-mentioned bank alleging its insolvency, asking for the appointment of receivers and the winding up of its business, but the bill did not specifically pray for a dissolution of the corporation. The decree appointed plaintiffs receivers, with power

to wind up the affairs of the bank, and directed that the assets be distributed according to the provisions of the Insolvent Law. The receivers filed the bill in this case against the president and directors to recover the money paid to them under the above-mentioned circumstances. *Held,*

1st. That the bill under which the receivers were appointed must be considered as having been filed under *Code,* Art. 23, sec. 264, &c., and that under the present bill the decree in the former case is not open to the objection that the averments of the former bill are defective.

2nd. That payments so made to the president and directors of the insolvent bank are invalid preferences under the Insolvent Law, and that the receivers are entitled to recover them.

Appeal from a decree of the Circuit Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Robert H. Smith* and *Edgar H. Gans* for the appellants.

Preferences may be invalid either (1) by reason of some general equitable principles, or (2) by reason of some statutory provision. It is essential for a clear apprehension of the questions involved in this case to discuss separately these two grounds for attacking preferences.

1. On general equitable principles it is argued that when a corporation is *insolvent,* its officers and directors become trustees for its creditors, and, if they *prefer* themselves, such preferences are void as being a breach of trust. We reply— even if such prove a correct statement of the principles of equity, it has no application to this case, because this corporation was never insolvent *in the sense* required by this principle. Insolvency in the sense intended by this equitable principle means commercial insolvency, an insolvency that looks to a speedy winding up of the business because of the inability of the corporation to pay its current obligations. In this alone lies the equity of the principle. If a corporation is about to stop business by reason of insolvency, there equity says, according to this principle, that

the creditors should stand upon an equal footing, and that trustees should not gain any advantage in the winding up over their *cestuis que trustent.* Indeed, any other in. ~rpreta-tion would make the principle a very foolish one. If m. ol-vency is taken in the sense of an inadequacy of assets to meet aggregate liabilities, that kind of insolvency does not portend a closing up of the business in the near future.

It has no application to the check paid the James Clark Company, because the president and directors had nothing to do with the payment of this check. It was paid in regular course by the cashier of the bank just as any other check. *Winchester* v. *B. & S. R. R. Co.,* 4 Md. 231.

The principle is not true as stated. Directors of a corporation, when the corporation is insolvent, but still transacting business, are not trustees for the creditors. This trust-fund doctrine was once in vogue in America, never in England, but has recently been confined to its true limits by the Courts of the United States, Maryland and many other States. The trust-fund doctrine, that is, that directors are trustees for creditors on the insolvency of the corporation, does not arise until proceedings in insolvency have been instituted, or some act done that in law is regarded as an act of insolvency. *Fear* v. *Bartlett,* 81 Md. 443–4; *Brant* v. *Ehlen,* 59 Md. 24–5; *Graham* v. *R. R. Co.,* 102 U. S. 148; *Hollins* v. *Iron Co.,* 150 U. S. 371; *Harper* v. *Car Co.,* 48 Minn. 174; *O'Bear* v. *Wolfer,* 106 Ala. 205; *Buell* v. *Buckingham,* 16 Iowa, 284; *Planters' Bank* v. *Whittle,* 78 Va. 737; *Whitwell* v. *Warner,* 20 Vt. 425, 444; *Smith* v. *Skeary,* 47 Conn. 47; *Warfield* v. *Marshall,* 72 Iowa, 666; *Schufield* v. *Smith,* 131 Mo. 280, 286; *Wiekman* v. *Bauerle,* 41 N. J. Eq. 635; *Brown* v *Grand Rapids,* 58 Fed. Rep. 286; *Bank* v. *Potts,* 90 Mich. 345. That directors are not trustees for creditors is the established English doctrine. *In re Winchman,* 38 Law Times Rep. N. S. 659; L. R. 9 Ch. Div., 322.

2. Statutory insolvent provision. Assuming the Maryland Insolvent Law to apply to this case, we contend that

the acts here complained of are not illegal preferences under its provisions. "A transfer made by a debtor, being actually insolvent or contemplating such act of insolvency, with a view to secure his property or any part of it, to one or more creditors, and thus prevent an equal distribution among all his creditors, is a transfer in fraud of the Insolvent Law." Insolvency here means "an inability of the debtor to pay his debts as they become due, *in the ordinary course of business.*" This is the statement of the Maryland law as to preferences. *Castleberg* v. *Wheeler*, 68 Md. 277. It requires that a debtor should be unable to pay his debts in the ordinary course of business, for otherwise he is not regarded as insolvent under the Maryland system. In this case there was no such inability; therefore, no insolvency; therefore, no illegal preference. It requires an intent to prefer—"with a view to secure his property to one creditor, and thus prevent an equal distribution among all his creditors." *Williams* v. *Cohen*, 25 Md. 486.

Again, the acts done were payments in the ordinary course of business whilst the bank was a going concern, and hence these payments, even if the bank were insolvent in the sense of the statute would not be preferences, whether the directors should have known the insolvency or not. *Hayden* v. *Chem. Nat. Bank*, 84 Fed. Rep. 875; *McDonald* v. *Chem. National Bank*, 174 U. S. 610.

If the contention of the receivers is correct, then all payments made to depositors at any time during four months before the receivership would be preferences. The proof shows that nearly all the depositors for whose benefit the suit is brought lessened the highest amount of their deposits, within the four months, to an amount much greater than the amount sued for.

To bring corporations under provisions similar to the provisions of the insolvent laws, the Act of 1896, chapter 349, was passed. *Poe's Supp.*, Art. 23, sec. 264. By this Act it was provided that when a corporation was proven to be insolvent "as in section 264 stated," then the preferences

void under the Insolvent Law when made by individuals
would be void under this law when made by corporations.
Under section 264, it was necessary, however, that the bill
should have been filed for the purpose of dissolving the
corporation.    It was only when the bill was filed "for that
purpose," and proof taken of insolvency under such bill,
that the Act of 1896, chapter 349, applied.    This was a
special statutory jurisdiction given to the Court of Equity,
and is strictly construed.    12 *Am. and Eng. Ency.* 277, n.
1; *Gelpin* v. *Page*, 18 Wall. 250.

An examination of the bill in the receivership case shows
conclusively that it was not filed for the purpose of *dissolv-
ing the corporation.*    As we have seen in the statement of
facts, there was no prayer for dissolution, nor any reference
to section 264 of the Code.    The right to receivers to set
aside acts of preference, that is, such acts as are preferences
under the State insolvent system, is not at all incidental to
the general jurisdiction of a Court of Equity.    For example,
if a corporation is proceeded against for the foreclosure of
a mortgage, because, being insolvent, it cannot pay the
coupons on its bonds, and receivers are appointed as inci-
dental to such a proceeding, such receivers cannot proceed
to set aside such preferences as would be void only under
the State Insolvent Law.    The jurisdiction is special and
statutory, and must be strictly followed.  The slightest inspec-
tion will show that the original bill was not filed under the
special statutory power in Courts of Equity to *dissolve cor-
porations.*    Therefore, the provisions of the Insolvent Law
have no application to this case.

*They have no application for another reason.*  Section 264A
gives receivers the right to set aside such preferences as
would be void under the insolvent laws, if made by an in-
dividual, with like remedies.    Whenever the insolvent laws
change, to that extent the corporate law, which only adopts
the Insolvent Law by reference, changes also.  If a new Act is
declared a preference under the insolvent laws, receivers of
dissolved corporations under section  264A could set it

aside.   If the insolvent laws are repealed, then receivers of
dissolved corporations have no law at all to rest upon in
setting aside preferences.   Now, our insolvent laws have
been superseded by the National Bankruptcy Law of 1898.
There is, therefore, now no longer any operative Insolvent
Law to which section 264A can apply.   It is true that the
Bankrupt Law contains a proviso keeping in operation all
proceedings begun under the State Insolvent Law before
the passage of the Bankrupt Law.   But this was not a pro-
ceeding begun under State Insolvent Law, but under the
corporate laws of the State, and, therefore, the proviso does
not apply.

Finally, the Court has no jurisdiction over the contro-
versy, as the plaintiffs have a complete and adequate remedy
at law, under the common counts.   This point was made
in the case of *Teakle* v. *Gibson* 8 Md. 70.   See argument
of *Norris* and authorities quoted page 81, but not passed
upon by the Court of Appeals, page 84; *Adair* v. *Winches-
ter*, 7 G. & J. 114; *Pomeroy Equity*, sec. 178.

*Wm. S. Bryan, Jr.*, (with whom was *Martin Lehmayer*
on the brief), for the appellees.

While we contend that Mr. Cahill had both actual knowl-
edge and fear of the bank's condition, the fact of such ac-
tual knowledge is, as matter of law, immaterial.   It was his
duty to know the condition of the financial institution of
which he was an officer, and such knowledge will be imputed
to him by an irrebutable presumption of law.   *Corbett* v.
*Woodward*, 5 Sawyer, 404; *McDaniel* v. *Harvey*, 51 Mo.
Appeal, 199; *Sicardi* v. *Keystone Bank*, 149 Pa. St. 148;
*Lowrey Banking Co.* v. *Empire Co.*, 91 Ga. 624; *Cook on
Stockholders*, sec. 661.

That what was done by Mr. Cahill amounts to a prefer-
ence is, it is confidently submitted, too plain for argument.
While it is very true that payments of checks made by an
insolvent bank *in the ordinary course of business* are not
esteemed preferences, it is settled by authority, that when

a payment is made, even in the ordinary course of business, if made with *intent* to prefer any particular creditor, it is illegal and void. *Boone on Banking*, sec. 301; 2 *Morse on Banking*, sec. 625; *Browne* v. *Harbeck*, 9 N. Y. 589. If the payment by the insolvent bank is *not* made in the ordinary course of business, it is always a preference. 2 *Morse on Banking*, sec. 625.

There can be no right on the part of the directors to prefer one creditor to another. "*Equity is equality*," and the directors are trustees for all the creditors alike, and therefore have no right to prefer one of their *cestuis que trustent* over the others. *Rouse* v. *Merchants' Nat. Bank*, 46 Ohio St. 493 ; *Richards* v. *N. H. Ins. Co.*, 43 New Hampshire, 263.

There are other decisions which hold that so long as the directors act in good faith, and without making any personal advantage, they can prefer one creditor over another, unless restrained by some local statute. *Onley* v *Conanicut Co.*, 16 Rhode Island, 597.

But almost all recognize the principle that the directors *cannot prefer themselves;* that being trustees or *quasi* trustees, they cannot make any personal gain at the expense of their *cestuis que trustent.* *Drury* v. *Cross*, 7 Wallace, 302 ; *Bradley* v. *Farwell*, 1 Holmes, 433 ; *Montgomery* v. *Phillips*, 53 N. J. Eq. 203; *Lippincott* v. *Carriage Co.*, 25 Fed. Rep. 577, 586; *Lowrey Bank's case*, 91 Georgia, 630–1; *Goodyear Rubber Co.* v. *Scott*, 11 South Rep. 370; *Hays* v. *Bank*, 51 Kansas, 535, 539, 540; *Olney* v. *Conanicut*, 16 Rhode Island, 597; *Hopkins & Johnson's Appeal*, 90 Pa. St. 69; *Swentzel* v. *Penn Bank*, 157 Pa. St. 140; *Risebroom* v. *Whitaker*, 132 Illinois, 81; *Lamb* v. *Cecil*, 28 West Va. 653 ; *Lamb* v. *Paunell*, 28 West Va. 663 ; *Beach* v. *Miller*, 130 Illinois, 162 ; *Haywood* v. *Lincoln Lumber Co.*, 64 Wisconsin, 639; *Smith* v. *Putnam*, 61 New Hampshire, 634; *Corey* v. *Wadsworth*, 99 Alabama, 68; *N. W. Mut. Life Ins. Co.* v. *Cotton Exch. Bank*, 70 Fed. Rep. 160, 161; 17 *Am. and Eng. Encyclopædia of Law*, 123; 2 *Morawetz on Corp*, sec-

tion 787; *Kittel* v. *Augustus F. & G. R. Co.*, 78 Fed. Rep. 855; *Halpin* v. *Mutual Brewing Co.*, 47 N. Y. Supplement, 412; *Seeds Dry Plate Co.* v. *Heyn Co.*, 77 Northwest. Rep. 660; *Rowe* v. *Leuthold*, 77 Northwest. Rep. 153 ; *Mayr* v. *Hodge*, 78 Ill. App. 556; *Wyman* v. *Williams*, 74 Northwest. Rep. 48; *Stough* v. *Ponca Mill Co.*, 74 Northwest. Rep. 860; *Tennant* v. *Appleby*, 41 Atl. Rep. 110.

FOWLER, J., delivered the opinion of the Court.

The questions we are to consider grow out of the failure of the South Baltimore Bank, which by a decree of the Circuit Court of Baltimore City, passed on the 1st of June 1898, was declared insolvent and dissolved. By the decree just mentioned the appellees, Messrs. Colton and Schott, were appointed receivers with the usual powers given to such officers and also with power to wind up, under the Court's direction, the affairs of the bank in conformity with the provisions of Art. 23 of the Code of Public General Laws in so far as the *same apply to the liquidation of the affairs of insolvent corporations through the agency of receivers* ; and to that end they were authorized to exercise and have " all the title, power and authority " which it is declared by the said provisions of Art. 23 shall be conferred upon, or vested in, receivers appointed by the Court of the estate or effects of corporations. In the exercise of the powers thus conferred upon them they brought two suits in the same Court by the decree of which they were appointed, one against The James Clark Company, a body corporate, and Winfield S. Cahill, and the other against Cahill, Norman H. Storey and Walter L. Denny. The first bill asked that the payment of a check of the James Clark Company on the South Baltimore Bank for $10,000 be declared a fraudulent preference, and the prayer of the second bill was to the same effect in reference to the payment of a note of said bank for $5,000, held by the Citizen's National Bank and endorsed by Cahill, Storey and Denny. The defendants named in both bills answered, fully denying all

fraud. Testimony was taken and the Court below found that both these payments were unlawful and fraudulent preferences. A decree was passed accordingly (the two cases having been consolidated by the agreement of all parties) and from that decree this appeal was taken.

There are but three questions in the case, only two of which require consideration, although at the hearing a number of other questions were discussed in a most interesting and able manner. The questions we are to consider are, whether, under all the circumstances of this case, the payments above referred to were made by the South Baltimore Bank, that is to say, by its officers and agents, at a time when it was insolvent and about to close its doors ; secondly, whether the payments thus made, when the corporation was insolvent in fact, by such officers, of their own claims to the exclusion of and to the detriment of other creditors of the bank are unlawful preferences within the meaning of the Insolvent Law; and third, whether, apart from the Insolvent Law and sections 264, 264A, Art. 23 Code, the payments made under the circumstances these were made will be declared by a Court of Equity to be consistent with a fair, equitable and just distribution of the assets of an insolvent corporation.

(1.) The first question is one entirely of fact and is fully answered in the affirmative by the testimony. Indeed it is conceded all the way through the case that the bank had been insolvent for several years. The evidence shows, without contradiction, that in addition to this long continued state of insolvency, the bank became *hopelessly* insolvent at the time when these payments were made, or immediately following thereupon. There is no denial of either condition of insolvency ; but the officers, especially the defendants, Cahill, Storey and Denny, who got the benefit of the payments, place their defense on their denial of knowledge of the bank's insolvency. We are forced to the conclusion, however, that if the bank is conceded to have been insolvent for years, its officers must have known

it, and that if it was hopelessly insolvent on the 23rd they knew or *ought to have known it* on the preceding business day when the payments were made. We have not overlooked the fact that Mr. Cahill and his coendorsers have denied that they had any knowledge of the insolvency of his bank at the time the payments were made. The fact that he was, as he said, only president in name, may to some extent account for his want of that accurate knowledge which he should have had. As president and director of·such a financial institution the law imputes the requisite knowledge and neither he nor they can be given, on account of their wilful ignorance, a better standing than they would have had if they had performed their duties. *Corbett* v. *Woodward*, 5 Sawyer, 416 ; *McDaniel* v. *Harvey*, 51 Mo. Appeal, 205; *Sicardi* v. *Keystone Oil Co.*, 149 Pa. St. 148 ; *Lowrey Banking Co.* v. *Empire Lumber Co.*, 91 Ga. 626; *Roan* v. *Winn,* 93 Mo. 511.

(2.) It was urged, with a good deal of force, that the bill, which was filed in the original case, in which receivers were appointed and dissolution decreed, and under which proceedings were first commenced against the South Baltimore Bank, was not filed under the provisions of sections 264 and 264A, Art. 23, relating to the dissolution and winding up of insolvent corporations, and that, therefore, the Court below had no jurisdiction to decree dissolution and that the Insolvent Law has no application to this case. Section 264, just referred to, provides, that "whenever any corporation in this State shall have been determined by legal proceedings to be insolvent, or shall be proven to be insolvent by proof offered under any bill filed under the the provisions of this section, it shall be deemed to have surrendered its corporate rights  *  *  *  and may be adjudged to be dissolved after hearing, according to the practice of Courts of Equity in this State, upon a bill filed for that purpose," &c., &c.  And section 264A, among other things, provides " that whenever such corporation shall have been adjudged to be dissolved, as provided in the next pre-

ceding section of this Article, all of its property   *   *   *
shall be distributed   *   *   *   in the same manner," as is
required by our insolvent laws.   (Art. 47 of the Code of
Public General Laws.)   And this section further provides,
that the receivers so appointed of such corporations shall
have *the same powers to bring suits and to set aside transfers,*
*payments and preferences made by the corporation, or by any*
*of its officers* on its behalf as the permanent trustee of a
natural person who is an insolvent debtor has under the In-
solvent Law of this State.   It was contended that the bill
in the original case does not specifically ask for dissolution
and that, therefore, it must be held not to have been filed
either for that purpose or under the sections mentioned.
It does, however, ask not only for the appointment of re-
ceivers, but also that the bank (a corporation), be declared
insolvent.   It prays for the "winding up" of the corpora-
tion by the distribution of its assets among the stock-
holders should anything remain after the payment of debts
and for general relief.   The Act of 1896, chapter 349, was
passed to bring corporations within the provisions of the
Insolvent Law, and to give Courts of Equity power to de-
clare them insolvent and dissolve them.   But, as we have
said, the decree shows the purpose of the bill.   Aside from
any other view, it would seem to be beyond the power of
these defendants in this case to deny the validity of the de-
cree dissolving the South Baltimore Bank.   It is true they
do not make a direct attack upon the decree nor deny the
jurisdiction of the Court to pass it.   But the contention is that
the bill was not filed for dissolution nor for winding up under
sections 264 and 264A, Art. 23; and that, therefore, the
Court was without jurisdiction to entertain this bill and
hence the Insolvent Law has no application.   The *decree*,
however, provides that the estate and assets of the bank
shall be administered according to that law, and that the
receivers shall have the same powers as to setting aside
illegal preferences which are thereby given to permanent
trustees.   Now, for the first time, it is suggested that the

dissolution decree is not to have full force and effect.    No such suggestion was made when that decree was before us in the case of *Colton & Schott, Receivers,* v. *Building Asso-ciation,* 90 Md. 85, and *Same Receivers,* v. *Lee Mayer,* de-cided last January Term, 90 Md. 711.    On the contrary, the receivers relied upon that decree to show that the ex-tent of their powers was the same as that of permanent trustees under the Insolvent·Law, and in the former case the opinions of this Court assume that the proceedings were under 264A, and in. the latter declare that the receivers were acting under that section.    Indeed, ever since the date of that decree, June 1st, 1898, declaring the South Balti-more Bank insolvent and dissolved, its affairs and estate have been administered by the receivers without objection from any quarter under the provisions of the Insolvent Law. It is perfectly obvious that all interested were *in fact* acting under the provisions of sections 264 and 264A.    The de-cree is conclusive upon this point.    It was passed without objection, if not with the implied consent of all parties.    If the intention had been unquestioned to proceed under those sections, and counsel had been instructed so to file the bill, but had omitted to add the three words, "they pray disso-lution," can it be supposed for a moment that any ·serious difficulty would have arisen from this omission ?    If atten-tion had been called to it in the Court below, the bill would have been amended in that respect.    No objection on the ground of defective averments of the bill nor any objec-tions based on want of jurisdiction could have been taken in this Court by the defendant.    In addition to this, if the bill now before us be regarded, as we think it may be, as a bill filed to carry into execution the dissolution decree, the law of the latter is not examinable, and will be enforced unless attacked by bill of review.    *Tomlinson* v. *McKaig,* 5 Gill, 256–278.    We do not, therefore, feel inclined favor-ably to consider this question of jurisdiction, presented as it is in this *collateral* way at this late day, and by some of the parties, too, at whose instance the decree now objected

to was passed. In *Hayes, Receiver,* v. *Brotzman,* 46 Md. 519, it was contended, as in the case at bar, that it did not appear from the record that the bill was filed under the provisions of the general incorporation law (Act of 1868, ch. 471); and that, therefore, the receivers could not rely upon section 195 of that Act (now codified as section 274 of Art. 23, Code), for authority to sue, but this Court said that the order of the Circuit Court, appointing receivers of the property and effects of that corporation, being the order of a Court of competent jurisdiction to pass it, carried with it the presumption of regularity. Unless, therefore, the decree appointing these receivers and declaring the bank insolvent be successfully attacked in some direct and proper way other than in this collateral manner, it must stand, and these appellees have a right to rely upon section 174, which expressly provides that receivers appointed as they were, and with the powers they have, shall have authority to sue in their own names. In the case just cited it was held, therefore, that whether the order appointing the receivers authorized them to sue or not was immaterial for their authority to do so is ample under section 195 of the Act of 1868, chapter 471, which is the same as section 174 of Art. 23 of the Code. But, in addition to this, the decree we are considering declares they shall have "all the title, power and authority," which, by the provisions of Art. 23, are conferred upon or vested in receivers appointed by the Court of the estate or effects of corporations. See also section 239 of Art. 23. If, therefore, the decree stands, then, under section 264A, these receivers have authority to maintain suits to set aside preferences by insolvent corporations in *the same manner and to the same extent* as the Insolvent Law gives to the permanent trustee of a natural person who is an insolvent debtor.

It can hardly be contended that the preferences which are here so earnestly defended, would be held valid under the provisions of sec. 22 of Art. 47, which prohibits preferences of every kind made by a party when insolvent or

in contemplation of insolvency. The fact that the bank, which is conceded to have been insolvent for several years and shown to have been hopelessly insolvent the day after the payments, had not actually *suspended payment* of its negotiable paper, and therefore had not committed that act of insolvency, has no tendency to prove that it had not made any of the unlawful preferences prohibited by law. The case of the *Gaslight Improvement Co.* v. *Terrell*, L. R. 10 Eq. p. 175, bears directly upon this aspect of the case, for the English Statute in respect to unlawful preferences is very similar to the provisions of our Insolvent Law, which, as we have seen, are adopted by section 264A of Art 23. In disposing of this case LORD ROMILLY, M. R., said: "The directors of the company think fit to pay themselves. It is to be observed that the directors of any company, who are also creditors, fill two distinct and antagonistic characters. In the first place they are trustees for the benefit ' of the company, and are *trustees for the creditors to that extent.*' They are bound to apply all the assets for the benefit of the creditors as far as they will extend. They themselves are also creditors, and have an interest to have their own debts paid. Now, if they had themselves passed a resolution to pay A, B, who was not a director, but a stranger to the company, nobody, in my opinion, would be found to assert that *that* was not a fraudulent preference, the creditor having done nothing, having made no application for the payment. Is the case altered by the fact that the creditor is one of the directors? So far from that being the case, in my opinion it only adds a *breach of trust* to the *fraudulent preference.*" It will be observed that the conclusion reached by LORD ROMILLY in the above case is not based on the so called trust-fund doctrine as adopted in this State (*Fear* v. *Bartlett*, 81 Md. 435), by which it is held that when a corporation has been dissolved or has committed an act which by law is an act of insolvency, its entire property becomes a trust-fund for the payment of its creditors in preference to the claims of stockholders.

(3.) This brings us to a consideration of the merits of the case. We are not willing to adopt the view which was so forcibly presented, that the payments here attacked as fraudulent preferences, are free from fraud and should be protected by a Court of Equity. On the contrary, our view is that whether the estate of *the insolvent* bank be administered under the Insolvent Law, or according to the rules which govern Courts of Equity, is immaterial, for, in either case, as we have seen, the rule of distribution is the same, and that rule requires fairness and equality and prohibits favor and preference. Assuming, therefore, that we have already shown that these payments were made to the officers of the bank when it was insolvent and about to close its doors, and that therefore, they are illegal preferences under the Insolvent Law, we will proceed to discuss the question whether apart from the Insolvent Law a Court of Equity will recognize them as fair and equitable payments.

In the case of *Finch Mfg. Co.* v *Stirling*, 187 Pa. St. 596, (41 Atl. Rep. 294), decided by Supreme Court of Pennsylvania in 1898, the preferred creditor, as in the case before us, was a president and director in both the debtor and creditor corporations. The Court said : " Although hampered by debts it did not follow that the company was insolvent. *Statutory insolvency* is generally determined as an inability to pay its debts when due or demandable; but the rule that an *officer* or *director* of an *insolvent corporation cannot prefer his individual debt* is based, not on *statutory insolvency*, but on the *unfair* and *fraudulent character of the transaction.* He is a trustee of the corporate property for the benefit of all creditors and stockholders, and has superior knowledge of the financial condition of his company. It would be highly unjust to permit him to use his position for his individual interest to the prejudice of others."

Before proceeding further with the discussion of this branch of the case, it must be remembered that it is a conceded fact that when Mr. Schott examined the statement of the affairs of the bank on the afternoon of Wednesday, the

23rd February, he found it hopelessly insolvent.    It is also conceded that it had been in an insolvent condition for several years.    This being so, it is useless to consume time to show the condition of the bank when the payments were made, and it follows that its then condition must have been known to its officers when Mr. Cahill took care of himself and his friends and coendorsers.    Mr. Cahill was practically the owner of the James Clark Co., as he owned all except four shares of its stock, which four shares were in the hands of others in order to have a legal organization. If there was any difference as to the degree of insolvency of the bank between the 21st February, when the payments were made, and the succeeding business day, when it is conceded to have been hopelessly insolvent, that difference must have been caused by the withdrawal of over $15,000 by Mr. Cahill to make the payments just mentioned.    In the case of *Fear* v. *Bartlett*, 81 Md. 435, it is said that " so long as the company is a going concern, having possession and management of its property, contracts made by and with the company, are governed by the same principles of law as contracts between individuals. "    And again it is said that the trust-fund doctrine has no application until proceedings in insolvency have been instituted *or some act done that in law is regarded as an act of insolvency.*    If the conclusion we have already reached be correct, namely, that the bank was insolvent at the time the payments were made, such payments must, we think, be regarded as unlawful preferences and therefore as acts of insolvency.    As we have seen, it is conceded the bank was and had been insolvent for some years, yet it is denied that this condition was known to its officers, and that therefore it was impossible for them to have violated the law.    But we think the evidence shows the very payments here objected to were made in contemplation of insolvency, not perhaps of the mild type of insolvency which appears to have been the normal condition of this bank, but in contemplation of that hopeless insolvency which supervened upon, and was doubtless

caused by, the payments. In the case of the *Receivers of People's Bank* v. *Patterson Savings Bank*, 2 Stocton's Chan. Rep. N. J. 16, the Chancellor says in regard to similar preferences : " If the legality of this transaction can be maintained, then it follows that after a bank has become so hopelessly insolvent that the directors have been forced to the conclusion that it is incumbent upon them at once to close the doors of the bank, and abandon the objects for which the institution was incorporated, they may employ the last half hour of existence in parcelling out to favorite creditors the few remaining assets of the bank still within their control, nay, it follows that the cashier of the bank may, after the directors have declared the bank insolvent, and have determined to notify the public of its insolvency, before the directors can reach the door to post up such notice, dispose of the assets at his pleasure to the creditors of the bank. For this is not the case contended for by counsel, that the cashier of a bank may lawfully meet all demands made upon it up to the moment the bank suspends payment. This he may do under ordinary circumstances, * * * *. But can he stand behind the counter, and while he is dealing out to importunate creditors their legal demands with one hand, with the other place assets of the bank in his pockets for absent friends and favorites." Of course the picture here drawn is not an exact representation of the situation now before us, but it clearly shows what may result if we sustain the positions which have been so ably supported by counsel for the appellant. Instead of equality among the creditors of a hopelessly insolvent corporation we should have the most glaring inequality, and not only the main object and purpose of our insolvent laws would be defeated, but, as we think, every rule of fair dealing would be violated.

It was said in *Fitzgerald Con. Co.* v. *Fitzgerald*, 137 U. S. 110, speaking of loans made by an officer and stockholder to a corporation, that " undoubtedly his relation as a director and officer or as a stockholder of the company does

not preclude him from entering into contracts with it, making loans to it and taking its bonds as collateral security ; but Courts of Equity regard such personal transactions of a party in either of these positions, not perhaps with distrust, but with a large measure of watchful care; and unless satisfied by the proof that the transaction was entered into in good faith with a view to the benefit of the company, as well *as of its creditors,* and *not solely with a view to his own benefit, they refuse to lend their aid to its enforcement.*" In *Section* 661 of 2 *Cook on Stock, Stockholders and Corporation Law* p. 936, the author, after quoting the foregoing sentence, says : " But where the corporation *is insolvent* an entirely different question arises. There has been a difference of opinion in the Courts, but the weight of authority clearly and wisely holds that an insolvent corporation cannot pay a debt due to a director in preference to debts due others, either by *turning over property or cash to him* or by *giving him a mortgage on corporate assets.*" The contrary doctrine we know has been held by a number of tribunals for which we have the highest respect, but we do not feel justified in extending this opinion to the length which would be required to cite and comment upon that line of cases. They will be found collected in the recent case *Corey* v. *Wadsworth,* 118 Ala. 488, s. c., 44 L. R. A. 766. See also *Lyons—Thomas Hardware Co.* v. *Perry,* 22 L. R. A. 802, where the conflicting decisions are reviewed in a note to that case. In many of the cases which hold that an insolvent corporation may legally and fairly pay its officers as preferred creditors, the well-known rule applicable to natural persons is adopted, that is to say, unless there is some statutory prohibition, a corporation has the same right to prefer its friends and officers that an individual has to prefer his friends and relatives, and that preference as applied to corporations as well as individuals is altogether a matter of favor, and is not based on any equitable principle whatever. We cannot assent to a doctrine fraught with such dangerous consequences. In our opinion a much wiser and safer rule is that announced by

the Court in the case of *The Sutton Manfg. Co.* v. *Hutchinson*, 63 Fed. Rep. 501, (JUSTICE HARLAN), that no preference will be allowed unless authorized by statute or legally given by the corporation.   As has been frequently said, a very large proportion of all the business of every kind in this country is done by corporations, and their creditors are, like themselves, found everywhere.   It requires but little foresight, however, to predict that if it be announced by Courts of Equity that corporations, insolvent or in contemplation of insolvency, or in failing circumstances, may pay the debts of their officers as preferred creditors, neither general creditors nor stockholders will have any redress.   With such protection as this view will afford, the president, directors and other officers, and stockholders who are creditors, secured as they will be by all the assets of the corporation, they may and will enter into fields of the wildest speculation without the fear of loss to themselves.   They may loan and have a right to loan their money to the corporation, and in violation of their duty they may speculate with it in the corporate name.   If losses result the stockholders and creditors must bear them, for the president and directors either take the money of the corporation to make themselves whole, or secure themselves by transfers and assignments of corporate property.   Such payments or transfers, unless void for some other reason, must, according to the contention of the defendants, be held good, whether the corporation be solvent or insolvent.   In our opinion, fairness and justice require that the officers should be placed on an equality, and no more than an equality, with the other creditors of the corporation.   And so in the case of *Sutton Manfg. Co.* v. *Hutchinson, supra,* HARLAN, J., says : "It is, we think, the result of the cases, that where a private corporation is dissolved or becomes insolvent, *and determines to discontinue the prosecution of business,* its property is affected by an equitable lien or trust for the benefit of creditors.   The duty in such cases of preserving it for creditors rests upon the directors or officers to whom has

been committed the authority to control and manage its affairs. Although such directors and officers are not technical trustees, they hold, in respect of the property under their control, a fiduciary relation to creditors, and necessarily in the disposition of the property of an insolvent corporation, all creditors are equal in right, unless preference or priority has been legally given by statute or by the act of the corporation to particular creditors." We refer also to *Rouse* v. *Merchants' Nat. Bank.* 46 Ohio St. 493; *Richards* v. *N. H. Ins. Co.* 43 New Hampshire, 263; *Drury* v. *Cross,* 7 Wallace, 302; *Bradley* v. *Farwell,* 1 Holmes, 433; *Montgomery* v. *Phillips,* 53 N. J. Eq. 203; *Corbett* v. *Woodward,* 5 Sawyer, 417; *Sicardi* v. *Keystone Oil Co.,* 149 Pa. St. 148, (24 Atl. Rep. 164.) See also 2 *Morawetz on Corporations* sec. 787, and notes for collection of authorities ; 2 *Cook on Stockholders,* sec. 661 and notes.

In concluding what we have to say upon this question, we will refer briefly to several of our own decisions, which we think are based upon the same salutary doctrine we adopt in this case. In the case of *The Hoffman Steam Coal Co.* v. *The Cumberland Coal and Iron Co.,* 16 Md. 456, the then Court, LE GRAND, C. J., rigorously applied to the officers of a corporation dealing with it the same rules that a Court of Equity will apply to the dealings between a trustee and his *cestui que trust. Md. Fire Ins. Co.* v. *Dalrymple,* 25 Md. 266. And in the *Cumberland Coal and Iron Co.* v. *Parish,* 42 Md. 598, the strict rule is again applied to the officers of a corporation. " The affairs of corporations are generally entrusted to the exclusive management and control of the board of directors ; and there is an inherent obligation, implied in the acceptance of such a trust, not only that they will use their best efforts to promote the interests of the shareholders, but that they will in no manner use their positions to advance their own individual interest as distinguished from that of the corporation, or acquire interests that may be in conflict with the fair and proper discharge of their duty." Certainly one of the

interests of every corporation is that while solvent all its creditors should be fully paid, and when insolvent that all its assets should be equally divided, and not awarded by the president and directors or other officers to themselves and their friends. While the exercise of this right of preference by insolvent corporations has been justified by the fact that Courts generally concede it to natural persons when not prohibited, yet there is no real analogy between the two cases. In the latter the individual freely and voluntarily confers the favor upon another, while in the former the persons by whom the corporation can alone act confer the favor upon themselves. There is nothing equitable in such preferences, whether exercised by an individual or by a corporation, and so long as it is not expressly conferred upon corporations and is neither incident to, nor necessary to, the accomplishment of any of their ends, and is so productive of unfairness and fraud, it should not, in our opinion, be given to them by implication. But again, is it not settled that so soon as the corporation becomes insolvent and when it is contemplating insolvency, its directors become trustees for all the creditors? If this be so, how can these very officers forget their duties as trustees, and appropriate to their own use the fund which the law has wisely dedicated to the equal payment of the creditors? It would be folly to hold that the trust-fund doctrine has no application except where an act of insolvency has been committed and the powers of the Insolvent Court have been actually invoked. It seems clear to us that if this doctrine is to have any efficacy it must be held to apply to a case like this where, as we have seen, the payments were made when the corporation was actually insolvent, and under circumstances which convince us that the directors knew, or were bound to know, the bank was hopelessly insolvent and would, as it did, the very next business day after the payments were made, close its doors and deny admittance to its depositors who wished to withdraw their deposits.

The payment of the $5,000 demand note of the South Baltimore Bank held by the Citizens' National Bank and endorsed by Cahill, Denny and Storey, it seems to us, was as much a breach of trust and violation of duty, so far as the endorsers are concerned, as was the payment of the $10,000 note directly to Cahill.   They were all directors, and if, as it was, their bank was then insolvent, they held its assets as a trust fund to be fairly and equally distributed among all the creditors.   It was a clear breach of trust to pay this note in full and thus relieve themselves from the obligation they had assumed.   If the directors, the bank being insolvent and about to close its doors, had met and passed a resolution to pay this note, in order to relieve the endorsers from loss, can there being any doubt that such payment would be held a preference as to them?   As was said in *Lee Mayer's case, supra,* the receivers may sue for and recover assets which have been disposed of contrary to law, and may maintain suits to set aside preferences, even when the corporation could not do so.   We see no good reason, therefore, why they may not also sue the endorsers on a claim from which they have been illegally and fraudulently released.   Under sec. 269, Art. 23, apart from sec. 264A., they are vested with all the estate and assets belonging to the bank and are declared to be trustees of the creditors and stockholders with all the powers necessary to wind up the affairs of the corporation.   In the case of *Willison* v. *Bank,* 80 Md. 198, it was held that the payment of certain notes by the insolvent to relieve the endorser from his liability on them was an illegal preference as to him, and the insolvent trustee was allowed to recover from the endorser the amount of the notes so paid.   It was contended that not only this note, but also the check for $10,000 of the Clark Company, was paid in the ordinary course of business; but in the face of the facts, which we think are established by the testimony, this view cannot prevail.   The check was paid by Cahill, as we have seen, to himself, when he was bound to know the bank was in-

solvent, and the demand note was paid without the asking, therefore, without demand and voluntarily, and before it was due. 2 *Morse on Banking*, sec. 625; *Willison* v. *Bank*, *supra*. So far from this being a payment in the ordinary course of business, a payment forced from a debtor by an importunate creditor, it was a voluntary preference in favor of Cahill and the other endorsers. *Receivers* v. *Patterson*, *supra*.

It is unnecessary further to consider the question how far a Court of Equity under its general jurisdiction, apart from sec. 264A., has power to appoint receivers to take possession of the assets and wind up insolvent corporations. In *State* v. *N. C. R. Co.*, 18 Md. 193, it is said, it is not against public policy to appoint receivers for property of corporations, when through fraud *or other cause* the property would otherwise be in imminent danger of loss to those interested. This same doctrine has been frequently announced by this Court. Thus in the recent case of *Davis* v. *Electric Light Company*, 77 Md. 41, where insolvency was not alleged, it was held that if the directors were pursuing a fraudulent policy which would ruin the company, receivers would be appointed. But this question is not important, for however defective the averments of the bill in the original case may be, as was said in *Hayes* v. *Brotzman, supra*, the decree in the case under which these receivers are acting being a decree " of a Court of competent jurisdiction to pass it, carried with it the presumption of regularity. It was not necessary, as contended by the appellee, that the appellant should have gone further and offered proof that the Circuit Court had acquired jurisdiction to pass the order, by proper averments in the bill." If, therefore, that decree be binding, the assets of this insolvent corporation will be distributed according to " the principles of equity," whether under the Insolvent Law as provided by sec. 11, Art. 47, or under the rules regulating a Court of Equity, in either case the rule of distribution being the same.

*Decree affirmed with costs.*

(Decided April 27th, 1900.)

SCHMUCKER, J., delivered the following concurring opinion :

I concur in the conclusion reached by the majority of the Court in this case, because in my judgment the payment by the South Baltimore Bank of the $10,000 to the James Clark Co., and that of the note for $5,000, on which certain of its directors were sureties, were made at a time and under circumstances when its directors must in equity be treated as having become trustees for its creditors, and as the payments were made to or for the benefit of certain of the directors, they constitute such preferences as should not be upheld.

The cases which have discussed the trust-fund doctrine, as applied to corporate assets, have been so fully cited in the opinion of the majority of the Court and the dissenting opinion of the learned Chief Justice, that it would serve no good purpose to cite them again in this one. Many of these cases in defining the doctrine use broad language and deny the right of directors of a corporation to take advantage of their position at any time to obtain preferences for themselves or for their unsecured debts. Other cases define it more strictly, and say that only where a corporation has been lawfully dissolved, or has become insolvent, does its property become a trust fund in the hands of its directors for the payment of its debts, and that so long as it is a going concern, having possession and management of its property, its transactions made *bona fide* in the ordinary course of its business will be upheld, whether they be made with its own directors or with strangers.

The decided majority of the cases when closely examined will be found to sustain the proposition that so long as the affairs of a corporation, even if its assets do not equal its liabilities, are in such condition that its creditors may fairly and reasonably expect it to continue its business and become extricated from its difficulties, they may lawfully continue its current transactions and pay its debts to themselves or to others as they fall due. But so soon as it becomes

apparent that the corporation cannot longer safely conduct its business, the directors become trustees of its assets for all of the creditors, in so far at least that they cannot prefer themselves in their distribution.    It would be both irrational and dishonest to say that the directors, after it has become plainly apparent that the corporation must stop, may keep it going for a few days longer until they can procure its debts to themselves to be paid, and then defend their action upon the pretence that the corporation was a going concern at the time when the payments were made.

The main purpose of the present opinion is to state, somewhat more fully than is done in the majority opinion, the facts which seem to me to call for the application of the trust-fund doctrine to the assets of the South Baltimore Bank at the time when the controverted payments were made.    The record plainly shows that the bank was then, and for several years prior thereto had been, actually insolvent.    It also shows that the fact of this actual insolvency, if not apparent upon the face of the bank's books, was so easily ascertainable by a slight examination into its affairs that the directors may fairly be held chargeable with knowledge of it, and its probable consequences.

Monthly statements of the assets and liabilities of the bank were currently made, and several of the statements showing its condition at and about the time of the payments in question appear in the record.    These statements are identical in their important items and all of them show that the bank's capital of $28,500, was impaired to the extent of more than one-half.    They further show that more than the entire remaining capital, amounting to $12,053.61, was locked up in real estate, that a still larger sum was in mortgages and that $4,115.30 was represented by unsatisfied judgments.    In fact, the only way the monthly statements were made to balance was by placing among the liabilities the capital stock at but $12,053.61, instead of $28,500, which was the true amount of stock then outstanding.

A slight inquiry into the nature and value of the assets appearing upon these statements would have disclosed the utter insolvency of the bank. The real estate, which appeared thereon at $13,213.54, was of little value and brought but $3,725, when sold. The mortgages, valued in the statement at $14,654, yielded less than half that amount, and one of the judgments was against an insolvent. The record shows affirmatively that on the day after the two payments in question were made, some at least of the directors were aware of the low value of these assets.

Now with the bank and its accounts in this condition, Simon P. Schott, who was the cashier of the American National Bank and an experienced bank officer, on February 19th, 1898, met Cahill, the president of the South Baltimore Bank, at its office by appointment for the purpose of ascertaining the condition of that institution, in order to determine whether he would be justified in asking some of his friends to furnish it additional capital. At this interview Schott was furnished by the officials of the bank with statements of its condition, including one or more of the monthly statements already described in this opinion. About two hours was spent in this interview, as Schott says, *"talking about the statement,"* which was at that time criticised by him. He called Cahill's attention to the erroneous character of the entry debiting the capital stock at but $12,053.61 when there was $28,500 of it outstanding, for which the bank had received par value in money, and warned him that the entry would not be passed by a bank examiner if the State should adopt a plan, then under consideration, of requiring a periodical examination of State banks.

On the following Wednesday, February 23rd, in the afternoon, Cahill and others of the directors of the South Baltimore Bank called upon Schott at his request at his office, having with them a statement of the condition of the bank. Schott says that his purpose in requesting Cahill

to bring the other directors with him was to verify the statement of the bank's condition *as to the worth of the assets.* He further says: "When we came together I asked about the various securities, or rather the various sums of money, appearing as assets in the form of real estate and judgments, *and the answers received satisfied me conclusively that the bank was in a hopelessly insolvent condition,* and so stated to the gentlemen present." Schott then expressed the opinion to the directors that they would be both morally and criminally liable if they continued the bank's business, knowing that it was insolvent. The directors had another conference that evening and as a result thereof they applied to the Circuit Court the next morning for the appointment of a receiver and a liquidation of the bank's affairs.

As Sunday and Tuesday, the 22nd of February, were holidays there were but two business days between the meeting of Schott with Cahill, on Saturday and his meeting with the directors on Wednesday afternoon. During those two business days, the debt of $10,000 to the James Clark Co., of which Cahill was substantially the sole owner, was paid, as was also the call loan of $5,000, for which he and others of the directors were sureties. It is unnecessary to repeat in detail the steps by which these payments were accomplished ; it is sufficient to say that they manifest an intelligent purpose and show an active participation on the part of Cahill. Cahill, in the meantime, on either Monday or Tuesday, had gone to the office of counsel and given directions for the preparation of a general assignment by the bank for the benefit of its creditors.

As over against the very pregnant circumstances which have just been narrated, it must be said that Cahill and several of his codirectors testify that they were ignorant of the bank's insolvency until informed of it by Schott on the afternoon of the 23rd of February, and Schott says that he did not express any opinion to the directors as to the solvency of the bank until that afternoon. Cahill further

says that he was influenced to give directions to counsel for the preparation of the proposed general assignment from the bank, not by its insolvent condition, but because he feared that the State was about to pass a law requiring banks to submit to examinations and maintain a reserve, neither of which things his bank could do.

The fact that Cahill, only two or three months before the bank's stoppage, bought its stock at $20 per share, the par value being $25 per share, and the further fact that he and the other directors were willing to endorse its $5,000 note, indicate that prior to February 19th, 1898, they did not properly appreciate the real condition of the bank. In view, however, of the purpose of the interview between Schott and Cahill at the bank on February 19th, the time which it consumed and the subject-matter of discussion during that time, and the alacrity with which the directors thereafter took steps to procure the payment of the debts due to them, or for which they were liable, I am unable to give my assent to the proposition that those payments were made *bona fide* in the ordinary course of business, or that they are in equity entitled to be protected. They seem rather to have been made after the attention of the directors, or some of them, had been called to the true condition of the bank, and in contemplation and upon the threshold of a stoppage of business and commercial insolvency.

What we have said does not conflict with the rulings of this Court in the cases of *Brant* v. *Ehlen*, 59 Md. 24–25, and *Fear* v. *Bartlett*, 81 Md. 443. In those cases the question of the fiduciary relation of the directors of a corporation to its creditors or of their right, if they also happen to be creditors, to prefer themselves or to secure an advantage at the expense of the other creditors was not before the Court for consideration.

In the cases of the *Hoffman Steam Coal Co.* v. *The Cumberland C. & I. Co.*, 16 Md. 456, and *The Cumberland C. & I. Co.* v. *Parish*, 42 Md. 605, although the fiduciary character of the relation of the directors of a corporation to its

stockholders was the subject directly under consideration, what was there said by the Court as to the design of the rule then announced being to secure a faithful discharge of their duties by the directors, and at the same time to close the door as far as possible against all temptations to do wrong on their part, might with propriety be applied to the situation of the directors of the South Baltimore Bank, in relation to its creditors at the time the payments in question were made.

(Filed April 27th, 1900.)

McSHERRY, C. J., dissented and delivered the following opinion :

The controlling facts of these consolidated cases are either not disputed, or if controverted they are free from difficulty; but there is a wide difference between the contending parties as to what are the legal principles which grow out of those facts and which ought to govern the ultimate decision of this litigation. A brief outline of the circumstances disclosed by the record will present with sufficient clearness the pivotal points of the controversy.

The South Baltimore Bank was incorporated by the General Assembly of Maryland in 1868. On the 24th of February, 1898, a bill in equity was filed against it in Circuit Court Number Two, of Baltimore, by certain creditors, and on the same day a receiver was appointed to take possession of its property and assets. In the bill of complaint it was alleged that the bank was insolvent and this allegation was admitted by the bank in its answer. Later on allusion will be made to this admission. The bill did *not* pray for a dissolution of the corporation ; but on June the first of the same year a decree was signed declaring the bank to be insolvent and adjudging that the corporation be dissolved. The proceedings of February the twenty-fourth were inaugurated at the instance of the board of directors of the bank ; and this action of the board was taken late on the evening of February the twenty-third. The cause

which induced the proceeding is of vital importance in this discussion, and fortunately it is devoid of doubt or dispute. The president of the bank, Mr. Cahill, who had been holding that position for about eleven months, was much interested in the success of the institution.   He was anxious to expand and enlarge it, believing that it was in a sound and solvent condition.   So fully was he impressed with this belief that he invited Mr. Schott, the cashier of the American National Bank, to whom he had been recently introduced, to join with him in an effort to increase the capital of the South Baltimore Bank.   Mr. Schott, feeling an interest in Mr. Cahill's earnestness, promised to look into the condition of the bank with a view of assisting in an extension of its business.   Neither Cahill nor any of the directors had at that time the slightest idea that the bank was not absolutely solvent.   Mr. Schott, pursuant to his promise, called at the bank on February the nineteenth and made a cursory examination of its statements, and observing some entries which he did not think were in proper form, suggested that if the bill were adopted which was said to be then pending before the Legislature, providing for the appointment of a State Bank Examiner and subjecting State banks to the same regulations and restrictions, which, under the Revised Statutes of the United States, are applicable to national banks, the examiner would probably find fault with those entries.   On the afternoon of February the twenty-third, about five o'clock, Mr. Schott, after discovering what Cahill and the other directors did not know that some of the securities carried by the bank amongst its assets were valueless or nearly so, informed Mr. Cahill that "the bank was in a hopelessly insolvent condition," and said to him "that if he continued doing business after learning that his institution was insolvent   *   *   *   he not only made himself morally but criminally liable."   Thereupon Cahill sent notice to the directors to convene that evening at the Carrollton Hotel.   When they assembled he disclosed to them the result of Schott's investigations, and

Schott being present confirmed Cahill's statement; and the following morning as a result of this meeting and pursuant to the action there had, the bill for the appointment of a receiver was filed.    Mr. Schott was appointed at once, and later on Mr. Colton was named a coreceiver.    There is no pretence that either Cahill or any other director or officer of the bank had the slightest suspicion that the bank was insolvent until Schott informed them that it was, and so informed them after the close of business on the evening of February the twenty-third.    Proceedings of some sort, but not proceedings founded on an allegation of insolvency or even involving the question of insolvency in any form, were undoubtedly contemplated by Mr. Cahill before the meeting of February the twenty-third.    Possibly on Monday the twenty-first, but at all events on Tuesday, the twenty-second, Mr. Cahill consulted Mr. Hazell, an attorney at law, with reference to a proceeding to wind up the bank if such a step should be deemed necessary by the directors in consequence of the supposed pending legislation at Annapolis.    But there can be no doubt in the world that this contemplated action had relation to, and was prompted solely by, a consideration wholly different from a suspected insolvency.    Mr. Cahill had been led to believe that a State law was pretty certain to be passed by the General Assembly, under which the bank would be required to retain as a reserve fund twenty-five per cent of its deposits, and would be prohibited from lending to any one person more than ten per cent of its capital; and he was convinced by the statements of Mr. Schott that if the bank could not, or would not comply with these provisions its doors would be closed as soon as the law should be passed.    Mr. Cahill seems to have been satisfied that it would be impossible for the bank with its limited capital of twenty-eight thousand five hundred dollars, and its comparatively small commercial deposits of about seventy thousand dollars, and its savings deposits of but a slightly larger amount, to continue business if this proposed law went into effect.    This was

explained to Mr. Hazell by Cahill and Cahill further stated to Mr. Hazell that there would be a meeting of the directors to consider the consequences of this proposed legislation, and that he, Cahill, wanted to have such papers prepared as might be necessary in the event of the directors " deciding to do anything." But there was not a suggestion or a suspicion at that time of the bank being insolvent or unable to pay its creditors in full ; nor was a receivership mentioned. The whole conference with Mr. Hazell and the papers which he was to prepare had relation exclusively to the bank legislation which Schott had informed Cahill was then pending in the General Assembly.

The James Clark Company is a corporation of which Mr. Cahill is the president and treasurer, besides being the owner of all the capital stock with the exception of four shares. This company, through Cahill, had repeatedly lent to the South Baltimore Bank, without interest, considerable sums of money to meet the needs of the bank's customers. These loans are spoken of in the record as special deposits ; and were purely for the accommodation of the bank. They differed from an ordinary deposit in this : That an ordinary deposit is made primarily for the convenience of the depositor, but these were taken from the James Clark Company's regular bank-account with the Citizens' National Bank and placed with the South Baltimore Bank exclusively for the latter's benefit. On the twenty-first of February, 1898, the amount due by the bank to the James Clark Company on this loan or special deposit was $10,545.77. It was subject to check whenever the James Clark Company needed the money. On the day just named the Clark Company, by Cahill, as treasurer, drew its check on the South Baltimore Bank for this sum and deposited the check in the Citizens' National Bank, where, as stated awhile ago, the Clark Company kept its regular bank-account. This was done before Mr. Hazell had been conferred with, and before there was any thought of closing the bank ; and it was done because Mr. Cahill needed the money to pay the bills of the Clark

Company.   The South Baltimore Bank was not a member of the Baltimore Clearing House.   It cleared through the Citizens' National Bank.   To enable it to do this it kept a deposit with the Citizens' National Bank and against that deposit the checks cleared for it by the Citizens' Bank were charged each day.   February the 22nd being a legal holiday the banks were not opened; and so this particular check for $10,545.77 appears in the transactions of February 23rd, upon which day it was charged against the account of the South Baltimore Bank.

On February the 21st the South Baltimore Bank paid the Citizens' National Bank a call-loan note of five thousand dollars.   The money had been borrowed five days previously, as the amount of interest paid shows.   This loan was evidenced by a note which Cahill, Story and Denny, directors, indorsed.   They indorsed it, not because an indorsement was required, but because by furnishing security the South Baltimore Bank procured the loan at one-half of one per cent less interest.   On the same day, February 21st, Cahill borrowed from the Citizens' National Bank for the South Baltimore Bank the sum of fifteen thousand dollars and pledged as collateral eighteen thousand dollars of the latter's commercial paper.   This is not an unusual occurrence in the banking business.

On the fourth of June, 1898, two bills in equity were filed by the receivers, one against the James Clark Company and Cahill; the other against Cahill, Story and Denny.  Under the first, the payment of the $10,545.77, made by the South Baltimore Bank to the James Clark Company on the check drawn February 21st, is assailed; and under the second, the payment of the $5,000 call-loan note on the same day is attacked.   Under the first, the receivers seek to recover back from the Clark Company and from Cahill the money paid by the South Baltimore Bank on the check.  Under the second they seek to recover from the *indorsers* of the call-loan note, but not from the Citizens' National Bank, the payee, the money paid by the South Baltimore

Bank to the Citizens' National Bank. · The two cases have been consolidated. The ground upon which recovery is sought in each case is the same : and that ground is that the payment of the check and of the note was a preference given to two creditors of the insolvent bank to the prejudice of all its other creditors, for whom and for whose benefit Cahill and the other directors were, in virtue of their office as directors, trustees ; and as trustees they were prohibited from preferring themselves at the expense of their *cestuis que trustent*. Did these transactions, under the conditions and circumstances stated, constitute prohibited preferences ?

A preference is an advantage, and to be a prohibited preference it must either be one which contravenes some equitable principle, or violates some positive statutory provision. In neither instance can it exist if there is no insolvency, because if there is no insolvency there can be no inequality in the payment of creditors ; and without inequality there is no advantage. At the foundation of the investigation, therefore, lies the inquiry whether on February the twenty-first, when these payments were made, the South Baltimore Bank was insolvent. But before this inquiry can be answered accurately or intelligently it is necessary that there should be a clear understanding of what is meant by the term insolvency. If insolvency means a condition where liabilities are greater than the value of assets, then the bank was, as subsequent events showed, not only insolvent on February the twenty-first, 1898, but it had been equally and continuously so for four years antecedently thereto. Such a test of insolvency, however, would wreck a large proportion of flourishing enterprises. What railroad or city passenger railway company, for instance, could possibly exhibit available assets equal in actual cash value to its bonded and other indebtedness? But if insolvency means merely an inability to pay debts when and as they mature, in the ordinary course of business, then the bank was not insolvent and its doors should not have been closed. There is a difference between a bank which has something less of assets

than of liabilities ; and a bank which has assets equivalent to, or greater than, its liabilities, if those assets are unavailable, or cannot be converted into money. But the advantage is on the side of the former. The one, having less assets than liabilities, may be able to continue its business ; whilst the other, having more assets than liabilities, might be forced to suspend because of its inability to meet the demands made on it in the usual and ordinary course. The first, though having a deficiency of assets, would be commercially solvent ; the second, though having an excess of assets would be commercially insolvent. The relation of the assets to the liabilities cannot, therefore, be the ultimate test of solvency.

The meaning of insolvency in its legal sense is not now open to debate in Maryland. Following the definition laid down by the Supreme Court in *Toof* v. *Martin,* 13 Wall. 40, this Court distinctly and categorically adjudged that insolvency must be taken to mean "an inability of the debtor to pay his debts, as they become due, *in the ordinary course of business.*" *Castleberg* v. *Wheeler et al.,* 68 Md. 277. Now, it is clear from the evidence that the bank was in better condition when it suspended business than it had been in for four years previously. There is nothing in the record to show that it was unable to pay its debts as they became due in the ordinary course of business. On the contrary, it *had* paid them as they matured in the past ; it was not without ample funds and it had facilities for procuring ready money if emergencies required that it should have more than its vaults contained. No bank that is not utterly stagnant and lifeless ever carries as much cash as it owes its depositors. Its *ability* to meet the demands made upon it as they mature in the due and ordinary course of business, and not the amount of cash on hand or the isolated fact that its assets are equal to its liabilities, is the test of its solvency and the measure of its duty to its creditors. The South Baltimore Bank had the confidence of the people of South Baltimore ; and Mr. O'Connell, cashier of the Citi-

zens' National Bank, and a totally disinterested witness, testified, " I believed it to be solvent then, and do yet, and I think it was in a great deal better financial condition than thousands of people who make fortunes and die rich. They had credit, character, standing, confidence and some money." " They never ought to have made an assignment." At the close of business on February 21st, after the payment of the $5,000 call-loan note, and after crediting the $15,000 borrowed on collateral, the bank had in its vaults and on deposit with the Citizens' National Bank, a balance of $31,409.50; and on the 23rd at the close of business, after paying the $10,545.77 check, it had a balance of $23,295.13, whilst its liabilities to depositors aggregated about $140,000. It thus had quite as large a reserve as is required to be held by national banks outside of New York, Baltimore and a few other cities, *sec. 5191 Rev. Stat. U. S.* Even if the $15,000 had not been borrowed, both the note and the check could have been paid and there would have been a balance of $8,295.13 still left in cash. But the $15,000 was procured, so Cahill says, to have a fund for customers who might wish to borrow—and this is not disputed or denied. During these same two days the deposits received —both commercial and savings—aggregated $24,608.50. If we turn to the statements and compare that of January 30th, 1897, with that of January 31st, 1898, it will be found that the commercial deposits rose from $45,380.39 to $71,610.91; and the savings deposits rose from $65,152.02 to $72,671.51. The loans and discounts swelled from $71,924.74 to $94,865.75.

These figures indicate a growth, a development and an activity rather than degeneracy or decline ; and as there is nothing in the record to show that the bank *could not* have continued in the usual, ordinary course, other than the single fact that it *did not* continue, because of being misled, there is no evidence of an insolvency in the legal sense of the term.

Now, if there is any credence to be placed in human tes-

timony, not an officer or a director of the bank had any knowledge that the bank was insolvent in either sense of the term.    Their acts are more emphatic and more significant than their words.    Though the capital stock was carried on the statements at less than fifty per cent of its par value of twenty-five dollars per share, both Cahill and Story bought shares at twenty dollars, or eighty per cent of par, shortly before the collapse, and that, too, though the stock thus bought, as well as that which they previously held, was subject to the double liability clause prescribed by *sec. 39 Art. 3 of the State Constitution* and by sec. 18 of the bank's charter.    On February 17th, Cahill, Story and Denny indorsed the call-loan note for $5,000, and Story made deposits as late as February 23rd.    It is simply incredible that these men would have purchased stock at nearly twice the value estimated in the statements ; would have exposed themselves to this double liability burthen; would have assumed responsibility as indorsers, and deliberately deposited their money up to the last moment the bank's doors were open, if they had not honestly believed the bank to be solvent.    If they are to be charged with knowing what they ought to have known, but did not know, then they could be charged with knowledge that the assets were less than the liabilities ; but that would not be knowledge that the bank was insolvent.

Whilst there can be no prohibited preference where there is no insolvency, there may be insolvency, in the popular sense, and still be no preference which contravenes any equitable principle though a payment has been made to one creditor, who is also a director, to the exclusion of other creditors.    The trust-fund doctrine, which is the equitable principle relied on to invalidate these payments, is said to have had its origin in *Wood's case*, 3 Mason, 308.    But that was a contest between stockholders and creditors of a bank, where the stockholders appropriated the assets to the exclusion of the creditors.    " But whatever may have been the origin of this doctrine," said this Court in *Fear* v. *Bart-*

*lett*, 81 Md. 443, " it means and can only mean, that when a corporation has been lawfully dissolved or has become insolvent, its entire property, including unpaid subscriptions to its capital stock, becomes a trust fund for the payment of its debts, and that creditors are entitled in equity to have their debts paid out of the assets of the company before there can be any distribution among the stockholders. * * * But it is only when the company has been dissolved or has become insolvent that this equitable doctrine arises. *So long as the company is a going concern, having the possession and management of its property, contracts made by and with the company are governed by the same principles of law as contracts between individuals.*" Other cases might be cited to the same effect, but they would make the principle no more apparent, though I may refer to *Comfort* v. *McFee,* 7 Lea. (Tenn.) 660. This trust-fund doctrine has never been pushed as far in this State as it is now attempted to carry it. When a corporation has ceased to be a going concern, when it has been dissolved, when it has no longer the possession and management of its property, or when it has become insolvent in the sense that it is unable to pay its debts as they mature in the usual and ordinary course of business, it may well be that all its assets and property become a trust fund, and that its officers and directors become trustees for the benefit of its creditors. But this doctrine has no existence during the time the corporation *is* a going concern, or whilst it has *not* been dissolved, or when it is *not* insolvent in the legal sense. Notwithstanding this, the specific contention with respect to the check is that if the depositor in a bank draws his check upon that bank and the check is paid in the usual and ordinary course, whilst the bank is a going concern, the payment of that check is a prohibited preference, if two days afterwards the bank closes its doors and goes into liquidation, and if the drawer of the check was a director or an officer of the bank. And the specific contention, with respect to the call-loan note is, that if such a note is paid

in the usual course of business and the debtor bank suspends operations a few days afterwards, the *indorsers* of that note, if they happen to be directors, must pay to the receivers of the debtor bank the money paid out of the funds of the debtor to the creditor bank in settlement of the call-loan note.    These contentions if sustained make the directors trustees for the creditors *whilst* the bank is a going concern and *whilst* it is still solvent; and besides that, they stand directly in antagonism to the principle which the Supreme Court applied in *McDonald* v. *The Chemical Nat. Bk.* 174 U. S. 610.    The Capital National Bank of Nebraska for some years carried on a large business intercourse with the Chemical National Bank of New York.  The Capital Bank transacted the usual and ordinary business of a national bank up to the close of banking hours on January 21st, 1893.    On the next day a bank examiner took possession of it and on February the sixth a receiver was appointed.    It appeared in evidence that on January 18th, 1893, the account of the Capital Bank with the Chemical Bank was overdrawn to the amount of $84,486.19, and, that by sundry remittances made, the overdraft was cut down to $25,515.32 on January 21st.    It also appeared that on January 18th the Schuster Hax National Bank of St. Joseph, Missouri, remitted by mail $2,000 to the Chemical Bank for the credit of the Capital Bank ; that on January 19th the Packers' National Bank of South Omaha, remitted to the Chemical Bank $5,000 for the credit and advice of the Capital Bank; that on January 20th—two days before it was closed—the Capital Bank remitted by mail to the Chemical Bank $735, in small items, and a package amounting to $2,935.60, and on the 21st—the last day the bank was open—another package amounting to $833.64.    On January 23rd—*after* the Capital Bank's doors had been closed by the Examiner—the Chemical Bank received the remittance of $2,000 of the 18th, and those of $5,000 of the 19th, and of $2,935.60 and of $735 of the 20th ; and on the 24th it received the remittance of $833.64 of the 21st.

The receiver of the Capital Bank filed a bill against the Chemical Bank to recover from it the moneys received by it after the suspension of the Capital Bank. The relief sought was denied. In the course of its judgment the Supreme Court said: "Nor can a finding that the payments and remittances made to the Chemical National Bank on the dates above mentioned were made in contemplation of insolvency and with an intent to prefer that bank be based on the mere allegation that the Capital National Bank was actually insolvent, and that its insolvency must have been known to its officers. It is matter of common knowledge that banks and other corporations continue, in many instances, to do their regular and ordinary business for long periods, though in a condition of actual insolvency, as disclosed by subsequent events. It cannot surely be said that all payments made in the due course of business in such cases are to be deemed to be made in contemplation of insolvency, or with a view to prefer one creditor to another. There is often the hope that, if only the credit of the bank can be kept up by continuing its ordinary business, and by avoiding any act of insolvency, affairs may take a favorable turn, and thus suspension of payments and of business be avoided. In the present instance there was not only no allegation of payments made in contemplation of insolvency, or with a view to prefer the Chemical National Bank, but there was no evidence that, up to the closing hours of January 21st, 1893, the Capital National Bank had failed to pay any depositor on demand, or had not met at maturity all its obligations. And the evidence fails to disclose any intention or expectation on the part of its officers to presently suspend business. It rather shows that, up to the last, the operations of the bank and its transactions with the Chemical National Bank were conducted in the usual manner. It may be that those of its officers who knew its real condition must have dreaded an ultimate catastrophe, but there is nothing to justify the inference that the particular payments in question were made in contemplation of

insolvency or with a view to prefer the defendant bank. The Chemical National Bank was no more preferred by these remittances several days before suspension than were the depositors whose checks were paid an hour before the doors were closed."

The trust-fund doctrine does not apply because the point of time at which, as respects creditors, it arises, if it arises at all, had not come to pass when the payments were made. There was no legal insolvency, and the bank was a going concern and had not suspended when the check was drawn and paid and when the call-loan note was settled. Both were paid in the usual and ordinary and accustomed course of business, and at a time when there was no doubt in the minds of the directors and officers that the bank was solvent, and when there was no thought of discontinuing its business. Under the most rigid and extreme application of the trust-fund doctrine the directors do not become trustees for the creditors, however they may stand towards the stockholders, until the corporation ceases to be a going concern or is insolvent in the sense of being unable to meet its obligations as they mature in the ordinary course of business. If this were otherwise, then no one could venture to be a depositor in a bank of which he was a director; and then, too, the very depositors for whose benefit the receivers are prosecuting these suits would be bound to pay back some ninety-six thousand dollars of funds drawn out by them within the four months prior to the suspension of the bank, if they happened to be directors or officers of the bank. For if it be a preference to pay *two* days before suspension, it is equally a preference to pay four months anterior thereto. The mere proximity of the time of payment to the actual suspension can make no difference in the legal principle, if it be a legal principle that such payments as these are preferences. The trust-fund doctrine as heretofore applied in Maryland has never been stretched to the length of declaring that the payment by a bank of the check of a depositor, drawn by him in good faith and in the usual course, was a

preference if the depositor happened to be a director and
the bank was a going concern and was believed to be per-
fectly solvent, though it closed its doors a few days after-
wards, not because it was unable to continue business but
because its officers were misled in supposing that it was in-
solvent when in fact it was commercially solvent.   Nor has
it ever yet been held in this State that the payment by a
going bank of a call-loan note to another bank in the usual
and ordinary course of business was such a preference as
would hold the indorsers of that note liable to the receivers
of the bank which made the note, merely because after the
payment of the note the debtor bank closed its doors and
turned out to be insolvent in the sense that the actual, but
not the nominal, value of its assets was less than the aggre-
gate of its liabilities.

But there is another view of this question which ought
not to be overlooked.   In the discussion thus far the situ-
ation has been treated from the standpoint that the check
for $10,545.77 was drawn by a depositor who was also a
director ; but the fact is that the depositor and the director
were not one and the same.   The depositor was a corpo-
ration, and the person who was the president of that cor-
poration was the director.   It was the check of the corpo-
ration which was drawn and paid ; and the precise ques-
tion is this : Does the circumstance that the president of
the depositing corporation was a director of the bank, pro-
hibit that corporation from withdrawing the money it had
on deposit if the bank's assets were less than its liabilities?
That question, presented under circumstances of conceded
and known insolvency, arose in the very recent case of
*O'Brien* v. *The East River Bridge Co.*, 56 North East, Rep.
(N. Y.) 74.   In that case a director of a bank being also
the president of the bridge company, became aware of the
impending insolvency of the bank, whereupon the check of
the bridge company for the sum of fifty thousand dollars,
being the balance to its credit in the bank, was drawn and
was signed by the president of the bridge company, who

was also a director in the bank. The full amount was secured in payment of the check on the same day that the bank was closed. It was held in a suit by the receivers of the bank against the bridge company, that the transaction was not void under the Stock Corporation Law, sec. 48, which prohibited an insolvent corporation, its officers and directors, from making any assignment or payment with intent to give a preference to a particular creditor, since there was nothing in that provision to prevent a depositing corporation from withdrawing its money on information of the bank's insolvency received by its president in his capacity as a director in the bank. It is not necessary for the decision of the case at bar to go that length.

If the receivers had sued the Citizens' National Bank to recover from it the five thousand dollars paid to it in settlement of the call-loan note, would they not have been confronted with and defeated by the case of *McDonald* v. *The Chemical Nat. Bk.*, *supra?* If the payment was made in the ordinary course of business, it was not a preference and the money could not have been recovered from the Citizens' Bank. Upon what principle, then, can the *indorsers* be made to pay to the receivers the money which was lawfully paid to the Citizens' Bank, and which the latter, if sued by the receivers, could retain as against them : If the Citizens' Bank could retain the money it is because the payment to it was lawful ; and if the payment to it was lawful, how can the *indorsers* of the note, who were only responsible at all, in the event that the note was *not* paid by the South Baltimore Bank, be made liable to the receivers because the note *was* paid and lawfully paid by the South Baltimore Bank ? If the payment was lawful, the indorsers cannot be held liable upon the theory that it was unlawful. *Sanford Fork and Tool Co.* v. *Howe*, 157 U. S. 312. Undoubtedly there are cases to be found in the books where directors of an insolvent corporation, who are also indorsers of its paper, have been denied preferences secured by themselves at the expense of other creditors ; and

in many of the opinions delivered in those cases very broad language has been used. But those cases could not be applied in this State without departing from, or greatly extending, the trust-fund doctrine as understood in Maryland.

It must be borne in mind that whilst there are vague allegations of fraud, there is not the slightest evidence to support them ; and the proof is clear and conclusive that not a person connected with the South Baltimore Bank had a suspicion that it was insolvent, until Schott so informed Cahill at five o'clock on the evening of February 23rd, long after these impeached transactions had occurred and had been closed. Not even Schott pretends that the bank was insolvent in the commercial sense of the term. The answer of the bank to the bill for a receiver admits insolvency, but obviously in the same sense that Schott understood it ; because that is the kind of insolvency charged in the bill—a deficit in the assets, but not an inability to pay demands in the ordinary course of business as they fell due.

It would be impossible in the limits of an opinion to review all the cases cited in the brief of the learned counsel for the appellees. To a great extent they involve different principles from the one now under discussion. For example : *Hoffman, &c.,* v. *Cum. C. & I. Co.,* 16 Md. 456, did not present a question of preference but a question of fraud. It did not involve the relation of a director towards a creditor, but the relation of a director towards the company. It concerned, not the payment by the company to a director of a *bona fide* debt, but the fraudulent acquisition of the company's property by the director. The question there and the question here are not analogous, but depend on entirely different principles. In *Swentzell* v. *Penn Bank,* 23 Atl. Rep. 415, the money was drawn *after* the bank had suspended payment. In *Brown* v. *Morristown, &c., Co.,* 42 S. W. Rep. 161, the corporation was insolvent when it sold all of its assets to its secretary in payment of a debt. Before the sale the directors had determined to quit business because of insolvency, and the secretary knew this. Of

course the sale in such circumstances was invalid. Cases not in line with the doctrine laid down in *Fear* v. *Bartlett, supra,* would not be followed in Maryland and need not be discussed.

If the two transactions assailed in these proceedings are not invalid because not in conflict with the trust-fund doctrine, are they void because contravening some positive statute?

*Sec. 14, Art. 47 of the Code,* as amended by the *Act of 1896, ch. 446,* declares that " No deed, or conveyance executed, or lien created by any person being insolvent or in contemplation of insolvency   *   *   *   shall be lawful or valid if the same shall contain any preferences   *   *   * and all preferences   *   *   *   shall be void, howsoever the same be made ; provided," the party creating them be proceeded against in a certain way and within a certain time and be declared, or becomes, " *under the provisions of this Article,* an insolvent." This provision of the insolvent law would have had no application to a corporation (*Ellicott Machine Co.* v. *Speed,* 72 Md. 25), had it not been for the *Act of 1896, ch. 349.* By that act a new section, known as sec. 264A., was added to *Art. 23 of the Code* relating to corporations. It provides that " whenever any corporation mentioned in *sec. 264* of this Article   *   *   *   shall have been determined or proven to be insolvent, as in said *sec. 264* stated, all payments, conveyances and assignments of money, property, debts or claims of said corporation, and all preferences howsoever made by it, or by any of its officers on its behalf, which would be void or fraudulent if the same had been made by a natural person, who had become an insolvent under Art. 47 of the Code,   *   *   * shall to the like extent and with like remedies, be fraudulent and void when made by such corporation or by any of its officers on its behalf, *and whenever any such corporation shall have been adjudged to be dissolved* as provided in the next preceding section,   *   *   *   *   all of its property and assets of every description shall be distributed to the

creditors of said corporation,   *   *   *   and the receiver of such corporation shall have the same power and authority to .maintain suits and proceedings to set aside preferences   *   *   *   as the permanent trustee of an insolvent debtor has under *Art. 47* of the Code,   *   *   *   and the date of the filing of the bill against such corporation, upon which it may be dissolved, shall be taken and treated for the purpose of determining the validity of preferences   *   *   * as the date of the filing of the petition in insolvency by or against a natural person."   *Sec. 264 of Art. 23* referred to in the above provision, declares, as amended by the *Act of 1894, ch. 263*, that "Whenever any corporation in this State shall have been determined by legal proceedings to be insolvent, or shall be proved to be insolvent, by proof offered under any bill filed under the provisions of this section, it shall be deemed to have surrendered its corporate rights, privileges and franchises, and may be adjudged to be dissolved after the hearing, according to the practice of the Courts of Equity in this State, *upon a bill filed for that purpose*" in the proper tribunal.   This collocation of the statutes discloses two things : First. That whilst a corporation cannot be proceeded against under the insolvent laws, its transactions may be dealt with, when it is proceeded against, according to the terms of the *Act of 1896*, that is, *sec. 264A*, precisely as the same transactions of an individual may be treated, if he were proceeded against under the insolvent laws.   Secondly. That the provisions of the *Act of 1896* or *sec. 264A* can only be availed of when the proceedings against the corporation have been taken under *sec. 264 of Art. 23 of the Code* as amended by the *Act of 1894*.   Now, as to the application of these two propositions, in their inverse order, to the pending cases.   What is the proceeding for which *sec. 264* makes provision ?   Its terms furnish the most satisfactory answer.   "Whenever any corporation shall have been determined by legal proceedings to be insolvent, or shall be proved to be insolvent by proof offered under any bill filed under the provisions of this section, it   *   *   *   *

may be adjudged to be dissolved  *  *  *  *  *upon a bill filed for that purpose.*"    When either of these two things occurs—that is when a corporation has been determined by legal proceedings to be insolvent; *or*, when it has been proved to be insolvent under a bill filed under this section; *then* it may be adjudged to be dissolved *upon a bill filed for that purpose.*    Obviously, then, there must be a bill filed for the purpose of having it dissolved, and that relief can only be granted when insolvency has been established in one or the other of the two modes indicated.    When the dissolution prayed for—when the dissolution which is the purpose for which the bill has been filed—has been decreed, *then* by the express terms of the *Act of 1896* or *sec. 264A* the assets shall be distributed " and the receiver  *  *  *  shall have the same power  *  *  *  to maintain suits  *  *  *  to set aside preferences  *  *  *  as the permanent trustee of an insolvent debtor has under Art. 47 of the Code ;" but not until such a decree has been passed. Now, the bill which was filed against the South Baltimore Bank and under which the receivers were appointed, nowhere prays for a dissolution of the corporation—it was not " *a bill filed for that purpose ;*" and as it was not a bill filed for that purpose, the subsequent decree dissolving the corporation, under a bill which did not pray for that relief at all, does not bring the assailed preferences within the terms of the *Act of 1896*, and they are not, therefore, such preferences as that Act denounces, or such as the receivers may assail.    The jurisdiction conferred by the *Act of 1896* is special and must be strictly pursued.    12 *Am. & Eng. Ency. L. 277*, note 1.

But  even if the statute of 1896—*sec. 264A*—were applicable, are these payments preferences within the meaning of *sec. 14 of Art. 47 of the Code*—the article relating to insolvency ?    Any  transfer  made  by  a  debtor,  and,  of  course, any  payment  made  by  him,  he  " being  then  actually  insolvent,  or  contemplating  such  state  of  insolvency,  with a view to  secure  his  property,  or  any  part  of  it,  to  one  or  more

creditors, and thus prevent an equal distribution among all his creditors, is a transfer (or a payment) in fraud of the Insolvent Law." *Castleberg* v. *Wheeler et al.*, 68 Md. 277. There must be insolvency or a contemplation of insolvency, *and* there must be a transfer or payment with a view, that is with an intent, to secure a particular creditor to the detriment of other creditors. When a debtor who *knows* that he is insolvent makes a payment or a transfer which operates to prevent an equal distribution of his assets amongst all his creditors, he is, in law, presumed to have intended to create a preference; because a preference is the natural and necessary result of such an act and he is held to have intended to bring about the natural and the necessary consequence of the act which he deliberately did. But if a debtor honestly believes himself to be solvent, he rebuts the presumption of intent to prefer which arises from the fact of actual insolvency. *Toof* v. *Martin*, 13 Wall. 40. An intent to prefer cannot be predicated of a payment made in total ignorance of insolvency. So it comes to the question: Was the bank insolvent within the meaning of the *Act of 1896, ch. 349*, and of *sec. 264, Art. 23 of the Code*, when the payments were made? The decree of June first does not answer that inquiry. The question is *not* whether Cahill and the directors had actual knowledge or were bound to know, and therefore were chargeable with constructive knowledge that the value of the assets was less than the sum of the liabilities; for, as already pointed out, that is not the test of insolvency under the insolvent law, and it ought not to be the test under the *Act of 1896 and sec. 264 of Art. 23 of the Code*. By the National Banking Act of 1864 it was provided that all payments of money made by a national banking association to its shareholders or creditors after the commission of an act of insolvency, or when in contemplation of insolvency, with a view to the preference of one creditor to another, "shall be utterly null and void." It was held in *Case* v. *Citizens' Nat. Bk. of La.*, 2 Woods, 23; *Morse on Banks and Banking*, 576, that the

word "insolvency" in this statute had the same meaning as in the National Bankrupt Act, and that it meant a present inability to pay in the ordinary course of business. Obviously by analogy the same meaning should be given to the word insolvency in the *Act of 1896* and in *sec. 264 of Art. 23* as this Court ascribed to it in the insolvent law—for the Act of 1896, though amendatory of the general corporation law, is, in fact, supplementary to the insolvent system. Was the bank, then, unable to pay its debts when due, in the ordinary course of business ? This question has been already answered in the negative in defining what was meant by insolvency, and it need not be repeated here. It is sufficient to say that there is not a particle of evidence in the record to show that it was unable to continue in business or to meet every demand made on it in the usual course ; and there is absolutely nothing from which it could be inferred that these payments were made in contemplation of insolvency, for they were not made in contemplation of stopping business because of insolvency. 3 *Ency. L.* (2nd ed.) 785. There is, however, most abundant evidence to prove that its officers honestly believed it to be perfectly solvent until misled by Schott late on the afternoon of February 23rd. It would be an exceedingly harsh and a hitherto untried construction of the Insolvent Law and of the Act of 1896 to hold, because subsequent efforts to realize the cash from some of the investments showed a shrinkage in the value of the assets below the aggregate of the indebtedness, that, *therefore*, though the same condition had existed for four years previously, the bank, notwithstanding it was a going and apparently a prospering concern, was insolvent when these payments were made, and that the directors ought to have known that it was.

As there was no such insolvency when the receiver was appointed, as the statute takes cognizance of, the payments made were not preferences which the Insolvent Law denounces ; and as there is no other statute prohibiting them, it follows, that they were not made in contravention of any

legislative enactment.   These payments, then, not having been made in breach of any settled equitable principle, and not having been made in violation of any statute, were not prohibited preferences; and the receivers ought not to be allowed to recover them.   It results, therefore, that the decree below, which directed the James Clark Company and Cahill in the one case; and Cahill and Denny (Story being dead) in the other case, to pay over to the receivers the money claimed under the bills filed against them respectively, is wrong and ought to be reversed and that the bills ought both to be dismissed.   This is the conclusion which a careful examination of the case has forced upon me; and I do not see how, entertaining the views I have expressed, I can escape dissenting from the judgment of the majority of my brothers.   There are many other cases I might cite, but it is not necessary.

(Filed April 27th, 1900.)