## S. DAVIES WARFIELD *vs.* H. IRVINE KEYSER AND REDMOND C. STEWART, ADMINISTRATORS OF HENRY B. KEYSER, DECEASED.

*Estoppel. Contracts: preliminary drafts; unsigned; not admissible in evidence.*

In a suit involving a contract, preliminary drafts of the contract that were not signed or entered into, were not admissible in evidence; from them the jury might draw unwarranted inferences.                              p. 166

B. and W., officers of a corporation, signed individually some notes executed by the corporation, in order to have them discounted; subsequently certain parties, including the said B. and W., agreed to advance sums proportionate to their holdings of stock to form a fund sufficient to pay off all the company's . debts; when such subscriptions matured and became due, B.'s father, K., was representing him and acting in his place, and W. collected from him B.'s contribution to said fund, but did not tell him of B.'s liability on the notes. The notes signed by B. and W., not being paid at maturity, were paid by W., and in a suit by him against B.'s administrator for his proportionate share of the notes, it was *held,* that no principle of estoppel prevented W: from recovering B.'s proportion for his liability on the notes, merely because, when W. had solicited K. for B.'s share of the subscription to the fund for the corporation, he had not informed K. as to B.'s liability on the notes.                              p. 167

The fact that B. at the time of making the notes knew or suspected that the corporation was insolvent, and did not so inform W., who was unaware . of the fact, would not have estopped B. from relying on any other defense that he might have had.                              p. 172

The president of a corporation personally promised another officer that if the latter joined him in personally signing certain notes to be discounted by the corporation, certain

debts due the corporation by the B. & O. R. R. would, when collected, be applied to the payment of one of the notes. The notes, not being paid by the corporation, were paid by the president, and in a suit by him against the estate of the other officer for his contribution, it was *held,* that the failure of the corporation to apply to such notes the collections made from the B. & O. R. R. did not operate as an estoppel to prevent his recovery for the contribution due on the notes.

pp. 170, 171

*Decided December 12th, 1912.*

Appeal from the Superior Court of Baltimore City (Dobler, J.).

The facts are stated in the opinion of the Court.

The following are the prayers that were offered and the ruling of the trial Court thereon:

*Plaintiff's First Prayer.*—The Court instructs the jury that if they believe from the evidence that the defendant, Henry B. Keyser, on the 31st day of July, 1896, being treasurer of the Maryland Manufacturing and Construction Company, and in charge of the financial affairs of that company, presented to the witness Thomas, as President of the Merchants' Bank of Baltimore, the two notes offered in evidence, and that said Thomas said that he would not discount said notes unless *they were endorsed by the plaintiff War-field and the defendant Keyser,* and that the defendant then took said notes to said plaintiff and reported to him what said Thomas had said, and said plaintiff and said defendant then wrote their respective names upon the back of each of said notes, and that there was no other agreement, contract or understanding, or intention between said plaintiff and said defendant at that time, and that said defendant thereupon took said notes immediately back to said Thomas, and they were discounted by the bank for the credit of said Maryland Manufacturing and Construction Company, and shall fur-

ther find that the said plaintiff has made the payments testified to by him on account of said notes on the dates so testified to, and that no payment has been made by said defendant on account of either of said notes, and shall further find that the advance made by said H. Irvine Keyser in what has been called the bicycle trust, was advanced by said H. Irvine Keyser personally and not as the representative of Henry B. Keyser, or because of his holding stock in the company, then the plaintiff is entitled to recover the half of each payment made by him except that made on April 1st, 1899, to wit, one-half of the sum of twenty-five hundred dollars paid on December 31st, 1900, one-half the sum of $672.68 paid on December 27th, 1902, and one-half the sum of twenty-five hundred dollars paid on December 27th, 1902, without regard to anything that may or may not have been said by the plaintiff Warfield in his negotiations with said H. Irvine Keyser in securing said advance. (*Granted.*)

*Plaintiff's Second Prayer.*—Even if the jury shall find from the evidence that when Henry B. Keyser executed the notes on July 31st, 1896, there was an account with The Baltimore and Ohio Railroad Company and that it was agreed between Keyser and Warfield that one of the notes should be paid from said account as stated in defendant's 2nd prayer, yet if they further find that when the notes were executed Keyser, as Treasurer, had reason to suspect that the company was insolvent, and Warfield did not, and that Keyser did not so inform him, and that before any payments were made by the said The Baltimore and Ohio Railroad Company, it was disclosed that the company had been so insolvent, then the failure of Warfield to apply the money so received to the payment of either of said notes would not relieve Keyser from his liability on either of said notes. (*Refused.*)

*Defendants' First Prayer.*—The jury is instructed that inasmuch as the payment claimed by the plaintiff of $412.50 as of April 1, 1899, was made more than three years before

this suit was brought and there is no evidence of any new promise by the said Henry B. Keyser or the defendants, the plaintiff cannot recover for that item. (*Conceded.*)

*Defendants' Second Prayer.*—If the jury believe that on the morning of July 31, 1896, the late Henry B. Keyser called at the office of the Maryland Manufacturing and Construction Company, in answer to a note from the plaintiff Warfield, asking him to call, and was then told they must discount the note at the bank for $5,000.00, and that it having been ascertained that the bank would not discount the note unless it was indorsed by the said Warfield and the said Keyser, after some contention as stated by the said Keyser, it was agreed between the said Warfield and the said Keyser that the amount to be discounted should be represented by two notes of $2,500.00 each made by the construction company, and that one of them should be paid from the money received from the Baltimore and Ohio Railroad as testified by the said Henry B. Keyser, and thereupon the said Keyser indorsed said notes.

And if they further find that said Warfield continued to be the President of said Construction Company, and that the said company in fact did receive from the said Baltimore and Ohio Railroad Company the payments between January 28th, 1897 and October 31st, 1897, both dates inclusive, amounting to $8,234.12, then they are instructed that said Henry B. Keyser was entitled to have one of the said notes on which he was endorser paid out of said sum of $8,234.12, thus leaving him responsible, if at all, for one-half of the other note with interest thereon.

And if they find that said Warfield as President of said Construction Company failed to apply such portion of said sum of $8,234.12, so received from said Baltimore and Ohio Railroad Company as was sufficient to pay one of said notes, then they are instructed that said Warfield is only entitled to

recover one-half of the following items of the account on which this suit is brought, namely:

| | | |
|---|---:|---:|
| Dec. 27, 1902—one-half of ........ | $2,500.00 | $1,250.00 |
| Dec. 27, 1902—one-half of ........ | 336.34 | 168.17 |
| Apr. 24, 1912—interest on ........ | 1,250.00 | |
| | 168.17 | |
| | $1,418.17 | |

($1,418.17) from Dec. 27—02 to this date.

(*Granted.*)

*Defendants' Third Prayer.*—If the jury find that after the two notes for $2,500.00 each were discounted with the names of Warfield and Henry B. Keyser on the backs of them, and while said Warfield was President of the Maryland Manufacturing and Construction Company, said Warfield went to the house of H. Irvine Keyser (the father of said Henry B. Keyser) and solicited him to make an advance of money to the said Construction Company, in the form of what has been called the bicycle trust, and told the said H. Irvine Keyser that the advance proposed to be made in that form would liquidate the debts of the Construction Company.

And if they find and believe that it was arranged that the stockholders of said Construction Company should make such advances in the proportion of their respective holdings of stock in said Construction Company—and that said Warfield did not tell the said H. Irvine Keyser that his son Henry B. Keyser was already liable to pay $5,000.00 on account of said company, and that said H. Irvine Keyser did not know of said liability and on said assurances given by said Warfield (if they shall find that they were so given) and on the plan proposed in the name of and on behalf of his son Henry B. Keyser did advance to said Construction Company the sum of $6,370.00 or thereabout, as the proportionate part of the advance to be made by said Henry B. Keyser, and that said $6,370.00 was totally lost, then they are instructed that said

plaintiff is estopped to claim the payment against the defendant set out in the statement on which this suit is brought. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*W. Irvine Cross,* for the appellant.

*Randolph Barton, Jr.,* (with whom was *Redmond C. Stewart* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is the third time this case has been before us—the previous appeals being reported in 100 Md. 72 and 103 Md. 161. The present appellant was appellee in each of those appeals, and although he recovered a judgment at the last trial it was for a less amount than he contends he was entitled to. There are two bills of exception—the first presenting the ruling on the admissibility of evidence, and the second including the rulings on the prayers.

The appellant was the president and Henry B. Keyser was the treasurer of the Maryland Manufacturing and Construction Company—a corporation engaged in the manufacture and sale of bicycles. The company needed funds and two of its notes for $2,500.00 each were discounted by the Merchants National Bank, after the appellant and Mr. Keyser had signed their names in blank on the back of them. They were payable "to the order of————," and the main question disposed of in 100 Md. was the character of liability incurred by those gentlemen, whether as joint makers or endorsers. After the first trial the defendant died and his administrators were made parties and at the second trial the defendants took the position that Messrs. Warfield and Keyser were either guarantors or endorsers and not joint makers. At the trial now before us for review other defenses were relied on, which will require us to state the facts more

fully than would ordinarily be necessary when a case has already been in this Court.

The two notes were dated July 31st, 1896, and have been paid by Mr. Warfield. He is seeking to hold the estate of Henry B. Keyser liable for one-half of the amount so paid by him, with the exception of one payment which was conceded to be barred by limitations. The testimony of Mr. Keyser given at the first trial was in evidence, as was that of Mr. Warfield, and hence we are not deprived of their respective versions of the transaction by reason of the death of Mr. Keyser, but they contradicted each other as to some of the material questions. Mr. Keyser testified that he consented to become responsible on the two notes on the agreement of Mr. Warfield that one of them should be paid out of a sum of money then due the company by the Baltimore and Ohio Railroad Company, and it was shown at the last trial that the railroad company did pay the Construction Company upwards of $8,000 at different times, beginning with January 28th, 1897, when it paid $1,484.33, and paid the same amount in each of the months of February and March. Mr. Keyser claimed that when he signed the notes there was due by the railroad company something over $2,900.00. Mr. Warfield positively denied that any such agreement was made, but said that he and Mr. Keyser signed their individual names on the notes because Mr. Thomas, the president of the bank, refused to discount them unless they made themselves individually responsible.

In the latter part of 1896, sometime after the notes were given, steps were taken to raise sufficient money to pay off the indebtedness of the company, which finally resulted in the company agreeing to deliver to Henry A. Parr, trustee, a number of bicycles for which a certain sum was to be paid by the trustee (apparently $25.00 per bicycle) and certain stockholders and some others contributed to a fund to be used by the trustee for that purpose, and the trustee was to apply the money to the payment of the debts of the company and distribute the surplus from the proceeds of sales made by him in proportion to the amount of the respective contribu-

tions to the purchase money. That arrangement is spoken of in the record as the bicycle trust. Mr. H. Irvine Keyser, the father of Henry B. Keyser, contributed a considerable sum, which the defendants contend was for the benefit of his son who was the largest stockholder in the company. The bicycle business in 1897 proved to be disastrous, and as a result the contributors lost instead of receiving a handsome return for the investment, as was expected. Mr. Irvine Keyser contends that he was induced by Mr. Warfield to make the contribution and that he (Warfield) told him it would enable the company to pay off its indebtedness but he did not tell him of these notes. The third prayer of the defendants granted by the Court is based on that transaction, and instructed the jury that if they found the facts set out in it the plaintiff was estopped to claim the payments against the defendants set out in the statement on which the suit was brought. The prayer will be considered later but these facts are now referred to as they reflect upon the first exception which we will now discuss.

1. At the close of the plaintiff's case, the defendants offered a tissue paper copy of a paper which purported to be signed by Henry B. Keyser and five others individually and by S. Davies Warfield, President of the Construction Company. It was dated November 23rd, 1896, and apparently referred to what is spoken of as the bicycle trust. At the same time they offered another paper dated on the —— day of October, 1896, which purported to be signed by Henry B. Keyser, per K., John K. Cowen, Henry A. Parr and Nelson Perin. That paper states that the undersigned stockholders, in order to aid in carrying six hundred bicycles, agreed to advance to said company sums equal to 45% of the par value of their respective holdings of stock, receiving interest on the sums advanced at the rate of six per cent. until paid. Opposite the name of Mr. Keyser is "$10,000," opposite that of Mr. Cowen "$2,000," that of Mr. Parr "$5,500" and of Mr. Perin "$6,000." The plaintiff objected to the introduction of either of said papers, and Mr. Phil-

lips who was formerly secretary of the company, was recalled as a witness. He did not identify either of the papers, but on the contrary his testimony tended to show that neither of them was the agreement finally entered into. The first bill of exceptions states that "The Court excluded the first or tissue paper copy, but allowed the second paper to be offered in evidence, in these words: 'If it is intended to corroborate Mr. Warfield's statement in his testimony it may go in for that purpose.' " Just what that means is not shown, as the defendant could have no object in corroborating Mr. Warfield's testimony, and his counsel objected to the paper being admitted.

It is not shown that that was the agreement which was fianlly executed, but on the contrary there is endorsed on the back of it: "Original agreement in regard to 600 wheels. Oct., 1896. Not carried out. See subsequent agreement." It is stated in the record that the "defendants then offered in evidence two papers to prove that the money paid to the company by H. Irvine Keyser was contributed by the representative of Henry B. Keyser," and then follow the two papers. But how a paper, which in the language endorsed upon it was "Not carried out," and which was not signed by Mr. Warfield, individually or as President of the company, and was not the paper under which the money was advanced by Mr. Irvine Keyser, could reflect on that question or could be admissible for any purpose, we confess our inability to see. The record does not even show where the paper came from. The contents are wholly different from those of the tissue paper copy and from the testimony in reference to the agreement that was made, and it was not claimed by Mr. Irvine Keyser that he advanced any money under it. That it was error to admit it seems to us clear, and we are also of opinion that it was injurious error. The jury had the right to suppose it was admitted for their consideration for some purpose and there would be great danger of their drawing unwarranted inferences from it.

2. We will consider the third prayer of the defendants in this connection, and will request the Reporter to insert it in his report of the case. It concludes by instructing the jury that the plaintiff is estopped to claim the money sued for if they find the facts therein set out. We are of the opinion that it ought not to have been granted. The defendants' theory is that the money advanced by Mr. Irvine Keyser was paid "in the name of and on behalf of his son, Henry B. Keyser." It certainly could not be contended that the plaintiff would be estopped from recovering from Henry B. Keyser or his personal representatives if Mr. Irvine Keyser paid $6,370.00 into the bicycle trust on his own account, merely because Mr. Warfield did not tell him of these two notes. There is no principle of estoppel known to the law that could be used as a defence to this suit on that ground. And if "in the name of and on behalf of his son" he advanced it to the construction company "as the proportionate part of the advance to be made by said Henry B. Keyser"—in other words, if he was simply representing his son and paying the money for him—upon what principle could the mere failure of Mr. Warfield to tell him of the notes estop the plaintiff from recovery? Henry B. Keyser knew as well as S. Davies Warfield that they had endorsed (we do not use the term in its technical sense) the notes. He was the Treasurer of the company, the largest stockholder and according to the evidence had as much if not more opportunity to know the actual condition of the company's affairs than the plaintiff. If Henry B. Keyser had died before the transaction between Mr. Irvine Keyser and the company, or had been incapable of attending to business, there might have been some reason for Mr. Warfield telling Mr. Keyser of the notes—although we do not want to be understood as conceding that he would then have been estopped from recovery merely because he did not tell him of them. He might even then have assumed that Mr. Irvine Keyser knew of them or he might not have had any reason to suppose that the latter's contributions to

the bicycle fund would have been affected by his knowledge
of the notes.  The prayer does not submit to the jury to find
whether the information was intentionally or fraudulently
withheld from Mr. Keyser.  If Warfield had been requested
to state the liabilities of the company and had concealed
these notes or omitted them from a list of the debts, it might
have presented a different question; but as it is, he might
well have assumed that Mr. Keyser as a business man would
not pay out $6,370.00 without knowing the actual condition
of the company—especially as his son was the Treasurer of
the company and presumably knew its financial condition.
But, as we have said, the son was living and he was not
mentally deficient and certainly knew that he had endorsed
the notes, and there could have been no possible reason for
Warfield making any special reference to them in order to
inform Mr. Keyser.  If Mr. Keyser was acting for his son,
as he claims was the case, then he was acting for one who
knew as much about the notes as Warfield did, and neither the
son nor his estate could escape payment of his share of the
notes because Warfield did not tell his representative what
he himself knew and what he was certainly as much under
obligation to tell his representative as Warfield was.

It was suggested that this prayer was not material because
the verdict was for the precise sum (with interest) named
in the second prayer, and therefore there was no injurious
error in granting it.  But the difficulty about that is that we
can not shut our eyes to the well-known fact that jurors are
often induced to consent to a verdict which they are not alto-
gether satisfied with by reason of something in the case which
affects their judgment in reference to the particular matter
they differ about.  Some of them might have been influenced
to find the verdict they did by reason of that prayer.  It is
undoubtedly true that many verdicts are reached by com-
promise, and in a case like this if some thought that under
the third prayer the plaintiff was not entitled to recover at
all, and others thought he was, they might have compromised

by rendering a verdict under the second prayer, which only allowed one-half of the plaintiff's claim.

3. The defendant's second prayer presents a somewhat novel question. We will request the Reporter to publish it in full, but some of the material facts submitted by it are that "after some contention as stated by the said Keyser, it was agreed between the said Warfield and the said Keyser that the amount to be discounted should be represented by two notes of $2,500.00 each made by the Contruction Company, and that one of them should be paid from the money received from the Baltimore and Ohio Railroad as testified by the said Henry B. Keyser, and thereupon the said Keyser endorsed said notes." It then left to the jury to find whether Warfield continued to be the president and whether the company did receive from the railroad company payments between January 28th, 1897, and October 31st, 1897, amounting to $8,234.12, and added "then they are instructed that said Henry B. Keyser was entitled to have one of the said notes on which he was endorser paid out of the $8,234.12." "and if they find that said Warfield as president of said Construction Company failed to apply such portion of said sum of $8,234.12 so received from the Baltimore and Ohio Railroad Company as was sufficient to pay one of said notes, then they are instructed that said Warfield is only entitled to recover one-half of the following items of the account on which this suit is brought." It then sets out those items and one-half of them.

It must be remembered that at the time the two notes were given Warfield was president and Keyser was treasurer of the company and indeed they so executed the notes for the company. According to Keyser he hestitated about becoming personally responsible on the notes but the bank would not loan the $5,000.00 to the company without security. He and Warfield according to the facts submitted in the prayer agreed that one of the notes should be paid out of the money the railroad company owed and thereupon Keyser endorsed it. It is not stated that Warfield agreed to see that

it was so paid and there is nothing to show that he was under more obligation to see that it was so paid then Keyser was. It does submit to the jury to find whether Warfield continued to be president, which is a fact proven by the record, but there is nothing in the prayer, or in the record, to show that Warfield had charge of the collection or the payment of the debts of the company. On the contrary the testimony is that those were the duties of the treasurer, and after Keyser ceased to act as treasurer Mr. Phillips had charge of the financial affairs of the company. Keyser knew that Warfield was then postmaster of the City of Baltimore and was not devoting all of his time to this company and he was not ignorant of Warfield's powers and duties for he was also an officer and was the largest stockholder of the company. The mere fact that Warfield as president of the company *"failed to apply* such portion of said sum of $8,234.12 so received from said Baltimore and Ohio Railroad Company as was sufficient to pay one of said notes" certainly could not make him liable to Keyser or prevent his recovery. There is nothing in the record to show that he had charge of the fund or had the power to apply it to the payment of this note. If there was such an agreement by Warfield it was as president of the company, for he could not as an individual have bound the company and Keyser in dealing with him as each knew that circumstances might arise which would prevent the note being paid out of that fund which Warfield could not control. If it was ascertained by the time the railroad company made the payments that the construction company was insolvent the question would at once have arisen as to whether the note on which these two officers were sureties could have been paid to the detriment of other creditors, under the principles announced in *James Clark Co.* v. *Colton,* 91 Md. 195, and if it had been paid Keyser and Warfield would not have been relieved of liability if the payment amounted to such a preference as would be prohibited under the rule of law announced in that case. The prayer therefore does not go far enough, for the mere fact that Warfield as president

failed to apply some of that money to one of these notes would not prevent him from recovering Keyser's share of what he had paid on them. If his failure to pay was owing to some act of his another question might arise but Keyser did not testify that Warfield guaranteed that the money should be so applied or made himself individually responsible if it was not. Keyser could have brought the agreement to the attention of the directors or to the new treasurer as well as Warfield could. They were equally interested in having the notes paid and there are not enough facts stated in this prayer to relieve Keyser from the liability which the law imposes on one joint maker of a note to another who pays it. We are of opinion that that prayer should have been rejected.

We have not referred to the fact that the second prayer speaks of payments by the railroad company amounting to $8,234.12 without submitting to the jury any facts from which they could determine when the debts were contracted. According to Mr. Keyser's testimony something over $2,900 was due when the notes were given and he claimed that the agreement.was that the payment was to be made out of that sum. He did not say in his testimony that it was to be paid out of any other fund and for aught that appears in the record the whole of the $8,234.12 might have been for debts contracted after the notes were given. Mr. Irvine Keyser testified that he did not know of these notes until he received from the plaintiff's attorney a letter dated December 10th, 1902. Apparently he was mistaken about that, as in a letter from Mr. Parr, trustee of the bicycle fund, to Mr. Irvine Keyser, which was dated December 20th, 1897, and was written to give Mr. Keyser information in reference to that fund, Mr. Parr said: "It is my intention just as soon as this obligation of $4,700.00 (which had been previously spoken of in the letter) is discharged to then get rid of the next pressing claim of the company which I would regard as the $5,000.00 endorsed note of the Merchants Bank." That apparently referred to these two notes which were frequently

spoken of as the $5,000.00 loan.   Mr. Henry B. Keyser was then still living and if Mr. Irvine Keyser was his representative he at least knew that as late as December 20th, 1897, one of the notes had not been paid out of the fund due from the railroad company and it was not contemplated that it should be paid out of that fund but out of the very money which Mr. Irvine Keyser and others had contributed to pay the debts of the company.

4. The plaintiff's second prayer was properly rejected. The part of it that "when the notes were executed, Keyser, as treasurer, had reason to suspect that the company was insolvent, and Warfield did not, and that Keyser did not so inform him," made it objectionable if it was not otherwise so.   Warfield as president could have known the condition of the company if he had chosen to look into it, and merely because Keyser had reason to suspect that it was insolvent, and did not inform the president of his suspicions would not have estopped Keyser from making the defense relied on in the second prayer if it was in other respects a valid defense. As intimated above if the company was insolvent when the money was collected from the railroad company then that fact might affect the question presented in the defendants' second prayer.

Although we regret that this case must be again remanded for a new trial, under our view of the rulings of the lower Court there is no other alternative and we must reverse the judgment.

> *Judgment reversed and new trial awarded,*
> *the appellees to pay the costs.*